## <u>AFFIDAVIT OF TASK FORCE OFFICER JOSHUA FRIES</u>

I, Joshua Fries, being duly sworn, depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.  I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States empowered by law to request a search warrant and to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      Since March 2022, I have been assigned as a Task Force Officer ("TFO") to the Cape Cod Resident Office of the Drug Enforcement Administration (the "DEA").   In addition, I am a Trooper with the Massachusetts State Police ("MSP") currently assigned to the MSP Detective Unit directed by the Massachusetts Cape and Islands District Attorney's Office.  I have been a Trooper since 2005.

3.      As a Trooper, I have participated in numerous investigations involving homicides, rapes, sexual assaults, and drug trafficking, among other felonies.  I have assisted, initiated, and/or participated in numerous narcotics investigations that have led to arrests and convictions for violations of Massachusetts drug laws.  My involvement in these investigations has resulted in the seizure of narcotics and firearms, and the forfeiture of narcotics and illicitly obtained proceeds.

4.      Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those tactics used to avoid detection by law enforcement.   I have examined cocaine, cocaine base ("crack"), heroin, methamphetamine, fentanyl, MDMA, marijuana, and other controlled substances as part of my professional experience.  I am aware of the prices commonly charged on the street for these substances.  I have received specialized training regarding the methods used to package, store, and distribute such

1

narcotics, and the methods used by drug traffickers to conceal and launder the proceeds of their drug trafficking activities.

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular telephones at the same time, and/or utilizing prepaid cellular telephones where the user of the phone is not required to provide personal identifying information.  I am familiar with the manner in which drug traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business to prevent detection.

6.      I have participated in the below-described investigation since April 2022.  I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, and other federal, state, and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation, and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources, including, but not limited to, the following:

   a.   My training and experience investigating drug trafficking;

   b.   Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

   c.   Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;[1]

   d.   Confidential sources of information;

---

[1]  The term "agents" as used in this affidavit should be understood to include federal, state, and local law enforcement officers.

    e.   Public and business records;

    f.   Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    g.   Location information for cellular telephones and motor vehicles;

    h.   Drug seizures;

    i.   Queries of law enforcement records and intelligence databases; and

    j.   Evidence obtained from judicially-authorized intercepted communications over the Target Telephones (as defined below).

## PURPOSE OF AFFIDAVIT

7.    This affidavit is being submitted in support of a criminal complaint against the following individuals (collectively, the "Target Subjects"):

    a.   John CAMPBELL, a/k/a "Jizz;"

    b.   Kenneth VEIGA;

    c.   Michael ATWOOD;

    d.   Austin GONSALVES;

    e.   Scott LAMBERT; and

    ████████████████████████████

charging that beginning at least in or about April 2022 and continuing until present, did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (the "Target Offense").

8.    This affidavit is also being submitted in support of applications for search warrants for the following locations (collectively, the "Target Locations"), which are described in greater detail below, and in attachments to the relevant warrant applications and warrants:

a. 53 Woodview Drive, Taunton, Massachusetts (also referred to as "Target Location # 1");

b. 6 Hunters Path, Whitman, Massachusetts (also referred to as "Target Location # 2");

c. 25 Marks Way, Carver, Massachusetts (also referred to as "Target Location # 3);

d. 116 Broadway, Fall River, Massachusetts (also referred to as "Target Location # 4"); and

e. 182 Glen Charlie Road, Wareham, Massachusetts (also referred to as "Target Location # 5"); and

f. 7 Stewart Drive, Unit #732, Abington, Massachusetts (also referred to as "Target Location # 6").

## SUMMARY OF EVIDENCE

*A. Background of the Investigation*

9.      In April 2022, DEA (and subsequently United States Postal Service Inspection Service ("USPIS") and Internal Revenue Service-Criminal Investigation ("IRS-CI")), began investigating CAMPBELL, of Taunton, Massachusetts, after receiving information from a cooperating source ("CS-1")[2] that CAMPBELL distributes cocaine and oxycodone. In the early stages of the investigation, agents conducted surveillance of CAMPBELL and utilized a court-

---

[2] I know CS-1's full identity, including CS-1's address and phone number. CS-1 provided information in exchange for consideration on pending drug charges. CS-1 reported that CS-1 has used illegal drugs in the past and that s/he is familiar with the packaging, paraphernalia, and jargon associated with drug trafficking. CS-1 has a Massachusetts criminal record that shows arrests (not convictions) for possession with intent to distribute a Class B substance in 2016 and 2018, and possession of a Class E substance in 2016. Information provided by CS-1 has been corroborated to the extent possible through T-III interceptions, telephone toll analysis, physical and electronic surveillance, and review of prior police and criminal records. I consider CS-1 to be reliable based on the fact that information provided by CS-1 has been corroborated by other evidence in this matter. CS-1 is not willing to testify because of concerns for CS-1's safety.

ordered GPS tracker on his vehicle, which revealed that CAMPBELL engaged in transactions with various individuals that, based on my training and experience, are consistent with drug trafficking. Between July 2022 and August 2022, agents conducted a series of controlled buys of oxycodone and cocaine from CAMPBELL using CS-1, as well as four controlled buys of oxycodone from him using an undercover agent (UC-1).   All four of these controlled buys were audio/video recorded.  UC-1 arranged the buys by telephone with CAMPBELL and those calls were recorded. Laboratory testing has confirmed that for all four undercover buys, the pills contained oxycodone. CAMPBELL supplied approximately 598 oxycodone pills to UC-1 over the course of the four controlled buys.

10.     During the next phase of the investigation, agents intercepted phone calls and text messages over CAMPBELL's phone, identified as Target Telephone 1, starting in November 2022.  Agents intercepted calls and text messages over Target Telephone 1 for two separate 30-day periods.  Agents also intercepted Target Telephone 2, used by VEIGA, for two separate 30-day periods and they intercepted Target Telephone 3, used by ████████ for thirty days.[3]

11.     Interceptions showed that, as described in detail below, VEIGA, of Whitman, Massachusetts, supplied oxycodone pills to CAMPBELL, who re-distributed oxycodone pills to LAMBERT, who lives in North Falmouth, Massachusetts, and ATWOOD, who lives in Carver, Massachusetts.  Based on my training and experience, and based on the quantities of pills that I believe LAMBERT and ATWOOD obtained, I believe they re-distributed oxycodone pills obtained from CAMPBELL to others.  On February 24, 2023, agents stopped LAMBERT's vehicle after he met with CAMPBELL and seized 73 oxycodone pills from LAMBERT, who admitted that they belonged to him.

---

[3] More information concerning Target Telephone 1, Target Telephone 2 and Target Telephone 3 (referred to collectively as the "Target Telephones") is included below in "Title III Electronic Surveillance."

12.     Interceptions have further revealed that VEIGA obtains oxycodone pills from ███████ who lives in the Houston, Texas area. ██████ flew to the Boston area on three occasions in February, March and May of 2023 during which intercepted calls and surveillance showed that VEIGA obtained oxycodone pills from █████   In addition to CAMPBELL, interceptions over Target Telephone 2 revealed that VEIGA redistributed oxycodone pills to GONSALVES, who lives in Fall River, Massachusetts.

*B. Title III Electronic Surveillance*

13.     On November 28, 2022, the Honorable Denise J. Casper, United States District Judge, District of Massachusetts, issued an Order authorizing the initial interception of wire and electronic communications to and from xxx-xxx-7598 used by CAMPBELL ("Target Telephone 1").[4]   Interceptions began on November 28, 2022 and terminated on December 27, 2022.   On February 15, 2023, Judge Casper issued an Order authorizing the renewed interception of wire and electronic communications to and from Target Telephone 1, and the initial interception of wire communications to and from xxx-xxx-7162 used by VEIGA ("Target Telephone 2").[5] Interceptions began on February 15, 2023 and terminated on March 16, 2023.   On May 1, 2023, Judge Casper issued an Order authorizing the renewed interception of wire communications and the initial interception of electronic communications to and from Target Telephone 2, and the

---

[4]   Agents identified CAMPBELL as the user of Target Telephone 1 based on several factors, including that UC-1 used this number for all text messages and phone calls with CAMPBELL, CS-1 identified this phone number as belonging to CAMPBELL and CS-1 used this phone number to arrange buys with him. Subsequently, agents confirmed CAMPBELL as the user of this telephone number based on the timing and substance of intercepted calls, combined with surveillance, as described herein.   Unless otherwise noted, all calls to/from CAMPBELL referenced herein were over Target Telephone 1.

[5]   Agents identified VEIGA as the user of Target Telephone 2 based on telephone records that show him as the subscriber of record for this phone number.   Subsequently, agents confirmed VEIGA as the user of this telephone number based on the timing and substance of intercepted calls, combined with surveillance, as described herein.   Unless otherwise noted, all calls to/from VEIGA referenced herein were over Target Telephone 2.

initial interception of wire and electronic communications to and from 832-665-1850 used by

█████████ ("Target Telephone 3").[6]  Interceptions began on May 2, 2023 and terminated on May

31, 2023.

14.     Throughout the course of the investigation, your Honor has signed warrants

authorizing the government to obtain precise location information about the Target Telephones,

and other telephones used in furtherance of the Target Offense, and to install GPS devices on

vehicles used by the Target Subjects.

**PROBABLE CAUSE**

15.     This section details the various role of the Target Subjects in the charged

conspiracy.  It is divided into three parts:  Part I focuses on the drug seizures in this case, including

both the four undercover purchases and the seizure from LAMBERT on February 24, 2023;[7]  Part

II focuses on the scope of the Target Subjects' drug trafficking activities and their relationships

with each other; and Part III focuses on the Target Locations and links to criminal activity at those

locations.

16.     The Target Subjects have been intercepted using coded language to discuss the

purchase and sale of oxycodone pills.  During interceptions, the Target Subjects have not explicitly

---

[6]  Agents identified █████████ as the user of Target Telephone 3, based on the timing and substance of
intercepted calls, combined with surveillance, as described herein. In addition, telephone records show that
this phone is subscribed to "One Thousand Auto," which holds a Chase bank account showing █████████
as a signatory to the account.  In addition, Target Telephone 3 is associated with a Cash App account with
a username "Bear█████████ that appears to be a nickname for █████████ Unless otherwise noted, all calls
to/from █████████ referenced herein were over Target Telephone 3.

[7]  In addition, as stated above, agents conducted a series of controlled buys in this case using CS-1 during
the weeks of May 1, 2022, May 12, 2022, May 23, 2022 and June 6, 2022.  Laboratory testing confirms
that over the course of these buys CS-1 obtained substances from CAMPBELL that contained oxycodone
or cocaine.  None of these buys were recorded, as CS-1 had concerns for his/her safety if the buys were
recorded.  Nonetheless, agents supervised the entirety of these buys.  For all of the buys, CS-1 was searched
both before and after the buy for contraband and money with negative results each time.  Agents followed
CS-1 as CS-1 traveled in CS-1's own vehicle both to and from the buys, and CS-1's vehicle was also
searched both before and after the buys for contraband or money, with negative results each time.

used terms like "oxycodone pills" or "Oxycontin pills."  The Target Subjects have instead used coded language, such as the colors of pills and the markings on those pills to describe the oxycodone pills.  I know from my training and experience, and conversations with other law enforcement officers, that drug dealers will speak in vague and coded language to conceal their criminal activity.  In addition, I describe numerous intercepted calls and identify participants in those calls.  Those identifications are based on a combination of several facts, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) cell phone subscriber information; and (3) business and court records listing the relevant cell phone number for a particular Target Subject. I base my interpretations of these communications upon my training and experience, the training and experience of other agents and my involvement in the investigation.  Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.  All times referenced herein are approximate.

### DRUG SEIZURES (INCLUDING UNDERCOVER BUYS)

*Undercover Buy # 1 – July 7, 2022 – CAMPBELL Sold 50 Oxycodone Pills to UC-1*

17.     On July 7, 2022, UC-1 conducted an undercover buy of 50 oxycodone pills from CAMPBELL.  At 5:23 p.m. that day, UC-1 called CAMPBELL.[8]  CAMPBELL did not answer. Two minutes later, at 5:25 p.m., CAMPBELL texted UC-1 from Target Telephone 1, "WTW," which I interpret is shorthand for "what you want?"  UC-1 responded, "Same as last time, U got all blues?"  One minute later, at 5:26 p.m., CAMPBELL texted, "HOW LONG."  UC-1 responded, "Maybe an hour."  CAMPBELL responded, "K," which I interpret to mean "okay."  At 5:27 p.m., UC-1 texted CAMPBELL, "Let u know when I'm close."  At 6:53 p.m., UC-1 texted CAMPBELL,

---

[8] Unless otherwise noted, all calls between UC-1 and CAMPBELL were consensually-recorded.  In addition, all buys between UC-1 and CAMPBELL were audio/video recorded.

"At Wendy's." CAMPBELL responded, "K 10MIN." At 6:54 p.m., UC-1 texted, "Kk," which I interpret to mean "okay."

18.     Based on my training and experience, and knowledge of the investigation, I believe that in the above phone calls and text messages, UC-1 arranged to purchase oxycodone pills ("blues") from CAMPBELL. UC-1 tried calling CAMPBELL, who did not answer, and CAMPBELL then inquired by text message what drugs UC-1 wanted ("WTW"). UC-1 then requested oxycodone pills ("U got all blues?"). UC-1 and CAMPBELL then texted about when they would meet, and UC-1 confirmed when UC-1 was close to CAMPBELL ("At Wendy's"). CAMPBELL then confirmed that he would meet UC-1 in ten minutes ("K 10 MIN").

19.     At 7:01 p.m., agents conducting surveillance observed CAMPBELL[9] leave his residence at 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1) and travel to an access road off of Industrial Park Road in Taunton, Massachusetts between a Clarion Hotel and Bay State College ("the Access Road") while driving a gray Chevrolet Silverado, bearing Massachusetts registration 3HXS94 (the "Gray Chevy Silverado").[10]

20.     At 7:05 p.m., CAMPBELL called UC-1 and said, "Here." UC-1 asked if CAMPBELL had just driven past UC- 1 ("Was that you that just drove by me?"). CAMPBELL responded, "Yeah, yeah, yeah, yeah." A conversation then ensued in which CAMPBELL directed UC-1 where exactly to meet him. UC-1 told CAMPBELL that UC-1 had passed "hotels . . on the right," and CAMPBELL instructed UC-1 to "take a left at the light" after the hotels. CAMPBELL advised that there would be "Amazon . . . on your right." UC-1 confirmed seeing "Amazon." Based on my training and experience, and knowledge of the investigation, in the above phone

---

[9] UC-1 identified CAMPBELL from reviewing a photograph of him.

[10] Between May 7, 2022 and August 19, 2022, agents obtained location information regarding the Gray Chevy Silverado from a court-authorized GPS tracking device. Location data from this GPS tracking device showed the Gray Chevy Silverado frequently in the vicinity of the Access Road.

conversation, I believe that UC-1 saw CAMPBELL drive past UC-1 ("Was that you that just drove by me?") and CAMPBELL confirmed it was ("Yeah, yeah, yeah, yeah.")

21.     CAMPBELL then gave UC-1 directions so that UC-1 could find where CAMPBELL was waiting to meet with UC-1.  At this point, the recording device malfunctioned, and no other communications between UC-1 and CAMPBELL were recorded.  UC-1 relayed that after seeing Amazon, UC-1 recognized CAMPBELL's vehicle, which was parked on John Quincy Adams Road near the Amazon building on Industrial Park Road.

22.     At 7:14 p.m., agents conducting surveillance observed UC-1's vehicle pull alongside the Gray Chevy Silverado on John Quincy Adams Road, with both driver's side windows facing each other.  After a few moments, both vehicles departed the area.  Agents continued surveillance of CAMPBELL, who drove the Gray Chevy Silverado back to 53 Woodview Drive, Taunton, Massachusetts. (Target Location # 1).  UC-1 and agents met for a debriefing.  UC-1 provided a cigarette package containing 50 blue pills that s/he reported receiving from CAMPBELL.  UC-1 also reported that s/he had provided CAMPBELL $1,900 in official advanced funds ("OAF") in exchange for the pills.  Testing by the DEA Northeast Laboratory shows these pills contain oxycodone.

*Undercover Buy # 2 – July 14, 2022 – CAMPBELL Sold 100 Oxycodone Pills to UC-1*

23.     On July 14, 2022, UC-1 conducted a controlled purchase of 100 oxycodone pills from CAMPBELL.  At 12:12 p.m. that day, UC-1 texted CAMPBELL, "U round tonight."  At 12:15 p.m., CAMPBELL responded, "YEA."  UC-1 responded, "Kk," followed by, "Can u get white."  At 12:18 p.m., CAMPBELL responded, "NO WHITE."  At 12:18 p.m., UC-1 texted CAMPBELL, "Kk" and "I call wen im close."  At 1:39 p.m., CAMPBELL texted, "COMIN LATER RIGHT."  UC-1 responded, "Yeah," followed by, "Gotta drop my kid."  Later that day, at 6:23 p.m., UC-1 texted CAMPBELL, "Yo" and, "Im close," followed by, "U round."  Based

on my training and experience, and knowledge of the investigation, I believe that UC-1 texted CAMPBELL to meet with CAMPBELL, who responded that he could ("YEA"). I believe UC-1 then requested cocaine ("Can u get white"), but CAMPBELL said he had no cocaine ("NO WHITE"). I believe UC-1 then told CAMPBELL that UC-1 would contact CAMPBELL when UC-1 was close ("I call wen im close.") CAMPBELL later confirmed that UC-1 still wanted to meet up ("COMIN LATER RIGHT"), and UC-1 confirmed the meeting after s/he dropped of his/her "child" ("Gotta drop my kid."). I believe UC-1 texted CAMPBELL to tell him that s/he was close by to conduct the drug deal ("Im close").

24.    At 7:27 p.m., agents conducting surveillance observed CAMPBELL, while driving the Gray Chevy Silverado, leave 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1). At 7:29 p.m., CAMPBELL called UC-1 from Target Telephone 1. CAMPBELL said, "Yo," and UC-1 responded, "Uh, I just had to run in and go to the bathroom. I'm coming over the bridge now . . . I'll be there in one minute." CAMPBELL responded, "All right." Based on my training and experience, and knowledge of the investigation, I believe that in the above call, UC-1 confirmed that s/he was on his/her way to meet with CAMPBELL ("I'm coming over the bridge") and CAMPBELL affirmed ("All right.").

25.    At 7:32 p.m. agents conducting surveillance observed UC-1's vehicle park next to the Gray Chevy Silverado on the Access Road, with both driver's side windows facing each other. Both parties departed the area within a few moments of meeting. UC-1 and agents met for a debriefing. UC-1 provided 100 blue pills that s/he reported receiving from CAMPBELL. UC-1 also reported that s/he had provided CAMPBELL with $3,640 in OAF in exchange for the pills. Testing by the DEA Northeast Laboratory shows these pills contain oxycodone.

*Undercover Buy # 3 – August 9, 2022 – CAMPBELL Sold 200 Oxycodone Pills to UC-1*

26.     On August 9, 2022, UC-1 purchased 200 oxycodone pills from CAMPBELL.  The day before, August 8, 2022, at 4:54 p.m., UC-1 texted CAMPBELL, "Yo, I'm back, can I see you tomorrow, looking 4 white and blues."  CAMPBELL responded, "No."  UC-1 then texted, "Blues??," to which CAMPBELL responded, "I got blue."  Later that evening, at 7:36 p.m., UC-1 texted CAMPBELL that s/he still wanted to meet the next day, "Imma come tomoro for blues." CAMPBELL responded, "K."

27.     Based on my training and experience and knowledge of the investigation, in the above conversation, I believe that CAMPBELL and UC-1 agreed to meet "tomorrow" to buy oxycodone pills.  I believe that UC-1 first indicated that s/he wanted both cocaine and oxycodone pills ("looking 4 white and blues").  I believe CAMPBELL said he only had oxycodone pills ("I got blue"), and both parties agreed to meet the next day ("Imma come tomoro for blues.").

28.     The next day, August 9, 2022, at 10:00 a.m., CAMPBELL called UC-1, and they agreed to meet later that evening for CAMPBELL to supply UC-1 with 200 "blues" in exchange for $7,000.[11]

29.     At 6:26 p.m., UC-1 texted CAMPBELL that UC-1 was seven minutes away. Around this same time, agents conducting surveillance observed the Gray Chevy Silverado parked in the driveway of CAMPBELL's residence at 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1).  At 6:32 p.m., agents observed CAMPBELL drive away in the Gray Chevy Silverado.  At 6:36 p.m., UC-1, who was driving his/her vehicle, and CAMPBELL, who was driving the Gray Chevy Silverado, arrived at the Access Road.  The two vehicles parked side-by-side, with both driver's side windows facing each other.  Both parties departed the area within a

---

[11] This call between CAMPBELL and UC-1 was not recorded.

few moments of meeting.  UC-1 and agents met for a debriefing.  UC-1 provided 200 blue pills that s/he reported receiving from CAMPBELL.  UC-1 also reported that s/he had provided CAMPBELL with $7,000 in OAF in exchange for the pills.  Testing by the DEA Northeast Laboratory shows these pills contain oxycodone. Location information for the Gray Chevy Silverado showed that vehicle return to 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1) after this deal.

*Undercover Buy # 4 – August 30, 2022 – CAMPBELL Sold 248 Oxycodone Pills to UC-1*

30.     On August 30, 2022, UC-1 conducted a controlled purchase of 248 oxycodone pills from CAMPBELL.  At 6:36 p.m. that day, UC-1 called CAMPBELL, who advised UC-1 that he would be ready for the deal in 30 minutes.[12]  At 6:58 p.m., CAMPBELL called UC-1 back and said, "Be ready in seven minutes."[13]  At 7:05 p.m., agents conducting surveillance observed CAMPBELL driving a blue SUV (the "Blue SUV") on Bay Street in Taunton, Massachusetts. Based on their vantage point, agents were not able to record the registration of the vehicle, but the car appeared to bear an out-of-state license plate.  At 7:07 p.m., CAMPBELL called UC-1 and said, "Seven minutes out."  At 7:11 p.m., agents conducting surveillance observed a male believed to be CAMPBELL exit 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1), and briefly get into a sedan parked on the property.[14]  At 7:14 p.m., the male believed to be CAMPBELL exited the sedan and got into the Blue SUV.

31.     A short time later, CAMPBELL called UC-1.  UC-1 answered, "Yo," and CAMPBELL responded, "Yo, I got 256."  UC-1 responded, "What?"  CAMPBELL repeated, "256, 256," and UC-1 asked, "Um, ok so, wait a minute, 2 . . . 256?"  CAMPBELL responded,

---

[12] This call between CAMPBELL and UC-1 was not recorded.

[13] This call between CAMPBELL and UC-1 was not recorded.

[14] Agents did not observe CAMPBELL enter the house after they had earlier seen him on Bay Street, Taunton, Massachusetts.

"Yeah." UC-1 responded, "alright, I will give you 87, right?" CAMPBELL then said, "yeah, just take out the difference for four of them."

32.     Based on my training and experience, and knowledge of the investigation, I believe that in the above conversation, CAMPBELL confirmed that he had 256 oxycodone pills to sell to UC-1 ("Yo, I got 256"). I believe that UC-1 did not understand CAMPBELL ("What?") and CAMPBELL repeated that he had the 256 oxycodone pills ("256, 256"). UC-1 then confirmed that the amount of pills was 256 ("Wait a minute, 2 . . . 256?."). CAMPBELL then affirmed ("Yeah."). UC-1 stated that s/he would pay $8,700 for the oxycodone pills ("alright, I will give you 87, right?"). I further believe based on the investigation that CAMPBELL said "take out the difference for four of them," because in previous phone calls CAMPBELL had agreed to sell 260 pills to UC-1, but now agreed to sell 256 or "four" less than what was originally planned.

33.     At 7:18 p.m., officers observed the Blue SUV and UC-1's vehicle park next to each other on the Access Road with the driver's windows of both vehicles facing each other. After a few moments, both vehicles departed the area. UC-1 and agents met for a debriefing. UC-1 provided agents with 256 pills, most of which were blue, that s/he reported receiving from CAMPBELL. A small number of the pills were yellow or white. UC-1 also reported that s/he had provided CAMPBELL $8,700 in OAF in exchange for the pills. Testing by the DEA Northeast Laboratory shows that these pills contain oxycodone.

*February 24, 2023 – CAMPBELL Sold 73 Oxycodone Pills to LAMBERT*

34.     On February 24, 2023, agents seized 73 oxycodone pills from LAMBERT after he met with CAMPBELL. The day before, February 23, 2023, agents intercepted calls and text

messages between LAMBERT and CAMPBELL in which they agreed to meet.   LAMBERT used telephone number xxx-xxx-6505 for these phone calls and text messages.[15]

35.     On February 24, 2023, at 11:05 a.m., agents established surveillance at 20 Edgerton Drive, Apartment 4D in North Falmouth, Massachusetts, which, I know from talking to other agents, is LAMBERT's residence.  Agents observed a white Toyota RAV4, bearing Massachusetts registration 6STG90 (the "White RAV4"), parked in the driveway of the residence.  At 11:40 a.m., agents observed the White RAV4 pull out of the driveway and travel onto Route 28A-North. Agents followed the White RAV4 as it traveled on Route 28A over the Bourne Bridge, onto Route 25 and onto Route I-495-North.[16]

36.     At 12:29 p.m., agents observed the White RAV4 take Exit 25 off of Route I-495 North.  Agents followed the White RAV4 as it turned onto Bay Street in Taunton, Massachusetts and then into the Myles Standish Industrial Park.  At 12:31 p.m., a pole camera showed the White RAV4 travel onto the Access Road and then into the parking lot for Bay State College.

37.     At 12:36 p.m., other agents conducting surveillance observed the Gray Chevy Silverado pull into the driveway of 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1).  At 12:45 p.m., agents observed the Gray Chevy Silverado depart 53 Woodview Drive, Taunton, Massachusetts and drive into the Myles Standish Industrial Park.  At 12:45 p.m., CAMPBELL texted LAMBERT, "2min."

---

[15]   Agents identified LAMBERT as the user of xxx-xxx-6505 based on the timing and substance of intercepted calls, combined with surveillance, as described herein.  Unless otherwise noted, all calls to/from LAMBRERT referenced herein were over telephone number xxx-xxx-6505.

[16] Agents briefly lost surveillance of the White RAV4 in the vicinity of the Otis Rotary in the time between it leaving the residence and crossing over the Bourne Bridge.

38.     At 12:47 p.m., a pole camera showed the White RAV4 travel onto the Access Road. At 12:49 p.m., the pole camera footage showed the Gray Chevy Silverado enter onto the Access Road.  Both vehicles met briefly and then departed the area.

39.     At 12:51 p.m., agents observed the White RAV4 and the Gray Chevy Silverado depart the Myles Standish Industrial Park.  Agents terminated surveillance of the Gray Chevy Silverado.  Agents observed the White RAV4 park in the lot for Brack's Grille & Tap, located near Myles Standish Industrial Park.

40.     At 12:57 p.m., agents observed the White RAV4 drive from the Brack's Grille & Tap parking lot to a Dollar Tree parking lot located nearby.  Agents also observed a female seated in the front passenger seat of the White RAV4.  At 1:11 p.m., agents observed the White RAV4 depart the Dollar Tree parking lot and get onto Route I-495-Southbound.  Agents maintained surveillance as the White RAV4 traveled from I-495 onto Route 25 in Bourne, Massachusetts.

41.     At 1:40 p.m., an MSP trooper stopped the White RAV4 on Route 25 in Bourne, Massachusetts.  Agents identified the driver, LAMBERT, as well as LAMBERT's female passenger (by comparison with a photograph and whose name is omitted here to protect her privacy) (the "Female Passenger").

42.     Agents instructed LAMBERT to exit the White RAV4.  LAMBERT told agents that he was coming from Middleboro.  Agents asked him if there were illegal narcotics in the vehicle.  He originally denied any drugs being inside the vehicle, but eventually stated that there were oxycodone pills in a compartment attached to the driver's side door.  Agents then requested that a trained K-9 come to the scene.  Shortly thereafter, K-9 "Shelley" arrived on scene and after searching the interior of the vehicle, she "hit" on the driver's side door of the White RAV4.  K-9 Shelley did not "hit" for any drugs after examining LAMBERT and the Female Passenger.

LAMBERT then retrieved two Krazy Glue sticks from the compartment attached to the driver's side door.  The two Krazy Glue sticks contained 70 blue pills and 3 while pills in total.

43.     LAMBERT told agents that the were his, and not the Female Passenger's. LAMBERT also claimed to be addicted to oxycodone pills after sustaining a shoulder injury, and claimed that the pills were for personal use, and not for distribution.  Testing by the DEA Northeast Laboratory shows these pills contain oxycodone.

### TARGET SUBJECTS' RELATIONSHIPS AND DRUG TRAFFICKING ACTIVITIES

44.     As described above and below, ▮▮▮▮▮ is an oxycodone supplier, who provided oxycodone pills to VEIGA.  VEIGA has distributed oxycodone pills to CAMPBELL and GONSALVES.  CAMPBELL has re-distributed oxycodone pills to ATWOOD and LAMBERT, who are believed to distribute to other drug traffickers.  Below, I describe the relationships among the Target Subjects and detail intercepted calls and surveillance that explain the nature and scope of their drug trafficking business and roles in the conspiracy.  The first half of this section is focused on the relationships between VEIGA, CAMPBELL, ATWOOD AND LAMBERT, as their roles in the DTO became clear earlier on when interceptions of Target Telephone 1 commenced.  The second half of this section is focused on the relationships between ▮▮▮▮▮ VEIGA and GONSALVES, whose roles in the DTO were revealed in the later interceptions over Target Telephones 2 and 3.

### CAMPBELL – VEIGA – ATWOOD

*November 29, 2022  – CAMPBELL Distributed 500 Oxycodone Pills to ATWOOD*

45.     On November 29, 2022, at 11:34 a.m., CAMPBELL sent a text message to xxx-xxx-9116, used by ATWOOD that read, "5 all small."[17]  At 12:04 p.m., ATWOOD responded to

---

[17]   Agents identified ATWOOD as the user of telephone number xxx-xxx-9116 based on the timing and substance of intercepted calls, combined with surveillance, as described herein.  Unless otherwise noted, all calls to/from ATWOOD referenced herein were over telephone number xxx-xxx-9116.

CAMPBELL, "K can grab them and we'll do it tomorrow morning," and CAMPBELL acknowledged the same at 12:05 p.m., "K." At 12:07 p.m., ATWOOD texted CAMPBELL, "If you can get more all small, I'll take them if you get a whole one." CAMPBELL responded, "K let me see."

46.     Based on my training and experience, and knowledge of the investigation, I believe that in the above text messages, CAMPBELL said that he had 500 oxycodone pills for ATWOOD ("5 all small"). I believe that ATWOOD then agreed to obtain the oxycodone pills from CAMPBELL the next day ("we'll do it tomorrow morning"). I believe that ATWOOD told CAMPBELL that he would like more oxycodone pills ("If you can get more all small"), specifically 1,000 pills ("a whole one"). I believe CAMPBELL told ATWOOD that he would check for ATWOOD ("K let me see").

*November 29, 2022 – CAMPBELL Contacted VEIGA to Obtain 400 Oxycodone Pills*

47.     Following the text messages with ATWOOD on November 29, 2022 described above, CAMPBELL checked to see if he could obtain oxycodone pills from VEIGA. On November 29, 2022, at 3:12 p.m., agents intercepted a call from CAMPBELL to Target Telephone 2. CAMPBELL said, "You got four tomorrow. My man just called me up." VEIGA said, "Um . . . I'm not sure right now. I'll let you know 'cause I'm in New York right now just looking at so . . . I'll hit you up when I'm on my way, and I'll figure it out." CAMPBELL responded, "Alright."

48.     Based on my training and experience, and knowledge of the investigation, I believe that during this call, CAMPBELL sought 400 oxycodone pills from VEIGA ("You got four tomorrow") for ATWOOD (based on the conversation with ATWOOD described above). I believe that VEIGA said that he was not certain he could supply the 400 oxycodone pills ("I'm not sure right now"). I believe that VEIGA told CAMPBELL that he would reach out to CAMPBELL on

his way back from New York ("Cause I'm in New York right now just looking at . . . so I'll hit u when I'm on my way.).[18]

*November 30, 2022 – CAMPBELL Distributed 500 Oxycodone Pills to ATWOOD*

49.     On November 30, 2022, at 8:15 a.m., CAMPBELL texted ATWOOD, "Only 5."[19] At 9:32 a.m., CAMPBELL called ATWOOD and said, "You're ready to go?"  ATWOOD responded, "I'll be . . . I'll be ready in like . . . I'll be ready in like 20 cause I'm just finishing getting ready."  CAMPBELL said, "Imma  . . . head down there.  So five."

50.     Based on my training and experience, and knowledge of the investigation, I believe that in the above text CAMPBELL told ATWOOD that he had only 500 oxycodone pills available to supply to ATWOOD ("Only 5.").  I believe that ATWOOD told CAMPBELL that he would be ready to meet CAMPBELL in 20 minutes ("I'll be ready in like 20 cause I'm just finishing getting ready.").  I believe that CAMPBELL reiterated that he would be supplying 500 oxycodone pills to ATWOOD ("So five").

51.     About twenty minutes later, at 9:58 a.m., CAMPBELL called ATWOOD and said, "Yo. What up? I'm 5 minutes away."  The line then disconnected.  At 10:07 a.m., CAMPBELL called ATWOOD and said, "Where you at?"  ATWOOD told CAMPBELL, "I'll see you in a second."  Based on my training and experience, and knowledge of the investigation, I believe that in these calls, CAMPBELL told ATWOOD that he was five minutes from the meeting location ("I'm 5 minutes away.").  I believe that in the second call, CAMPBELL indicated that he was

---

[18] Later, at 5:39 p.m., CAMPBELL texted VEIGA, "No go?"  I believe that CAMPBELL sent this text message to see if VEIGA did in fact have any oxycodone pills as CAMPBELL had requested earlier that day.  There was no further communication from VEIGA that day confirming whether he had the pills sought by CAMPBELL.  As described below, I believe that because CAMPBELL could not obtain more oxycodone pills for ATWOOD, he eventually sold a lower amount as they had earlier discussed.

[19] Based on my training and experience and knowledge of the investigation, I believe that the reference to "5" here means 500 pills of oxycodone. It is not clear why CAMPBELL changed the order to 500 pills after agreeing to sell 600 pills to ATWOOD the afternoon before.

waiting for ATWOOD arrive ("Where you at?") and I believe ATWOOD told CAMPBELL he was close to CAMPBELL ("I'll see you in a second.").

52.     On November 30, 2022, at 9:29 a.m., agents established surveillance in the vicinity of CAMPBELL's residence at 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1).  Agents observed the Gray Chevy Silverado parked in the driveway.  About five minutes later, at 9:35 a.m., agents observed the Gray Chevy Silverado on Bay Street in Taunton, in front of a Wendy's Restaurant.  Agents then observed the Gray Chevy Silverado travel onto Route 495 South. Agents followed the Gray Chevy Silverado as it exited 495 South onto Route 58 in Carver, Massachusetts.  At 10:05 a.m., agents observed the Gray Chevy Silverado pull onto Hammond Street, Carver, Massachusetts.  Based on my training and experience, and the context of the calls between CAMPBELL and ATWOOD, I believe that CAMPBELL supplied oxycodone pills to ATWOOD on Hammond Street, Carver, Massachusetts.

*December 16, 2022 – ATWOOD Ordered 700 Oxycodone Pills from CAMPBELL*

53.     On December 16, 2022, at 2:54 p.m., ATWOOD called CAMPBELL and said, "So are we gonna do anything in the morning?  Cause I need to know so I can grab before I go there?"  CAMPBELL said, "What you wanted?"  ATWOOD said, "I said . . . I can take like nine."  CAMPBELL said, "Alright, let me hit him up."  Based on my training and experience and knowledge of the investigation, I believe in the above call, ATWOOD called CAMPBELL to acquire drugs the next day ("So are we gonna do anything in the morning").  I believe that CAMPBELL asked what amount of drugs ATWOOD sought ("What you wanted?").  I believe that ATWOOD indicated he wanted 900 oxycodone pills ("I can take like nine.").  I believe that CAMPBELL indicated that he would contact VEIGA, his drug supplier ("[L]et me hit him up.").

*December 16, 2022 – VEIGA Agreed to Supply 700 Oxycodone Pills*

54.     Immediately after the call between CAMPBELL and ATWOOD, at 2:55 p.m., CAMPBELL texted VEIGA, "U got 6?"  VEIGA responded, "Rn or tomorrow?"  CAMPBELL then wrote, "Am gonn have to meet in lake." VEIGA again asked, "Today or tomorrow?" and stated, "Yea ill be ready jus lmk." At 3:05 p.m., CAMPBELL texted VEIGA, "7."  VEIGA responded, "Aight hmu in am."  Based on my training and experience, and knowledge of the investigation, I believe that in this conversation CAMPBELL asked VEIGA if VEIGA could supply 600 oxycodone pills ("U got 6?").  I believe that VEIGA inquired if CAMPBELL needed the oxycodone pills that day or the next day ("Rn or tomorrow.")  I believe that CAMPBELL then advised VEIGA that he actually sought 100 more pills ("7"), and VEIGA responded that CAMPBELL should contact VEIGA the next morning ("Aight hmu in am").

55.     At 3:11 p.m., CAMPBELL texted ATWOOD, "meet at 10 lakeville," and ATWOOD responded, "Okay so u got 9 and no big right."  CAMPBELL responded, "N 9."  I believe that CAMPBELL told ATWOOD to meet him at 10 a.m. at 22 Staples Shore Drive, Lakeville, Massachusetts ("meet at 10 lakeville").[20]   I believe that ATWOOD asked if CAMPBELL had 900 oxycodone pills, and no larger-sized oxycodone pills ("u got 9 and no big right").  I believe CAMPBELL affirmed that he had 900 oxycodone pills ("N 9").

56.     On December 17, 2022, at 9:52 a.m., CAMPBELL called VEIGA and directed VEIGA to meet him at "22 Staples Shore, Lakeville."  VEIGA asked CAMPBELL, "You want the seven?," to which CAMPBELL affirmed, "Yeah." VEIGA replied, "Um . . . yeah, I'll be over

---

[20] I believe that CAMPBELL was at the time remodeling this house to "flip" it and he directed VEIGA to this residence because he was remodeling this residence.  As described below on February 16, 2023, CAMPBELL and VEIGA discussed CAMPBELL "selling" this house, which I believe is consistent with "flipping" the property, i.e. buying it and then selling it quickly for a profit.  Moreover, records from Zillow.com show this property was purchased on October 21, 2022, listed for sale on January 25, 2023 and sold on May 2, 2023.  This chronology is consistent with CAMPBELL flipping this property.

there in 35 minutes."  Based on my training and experience, and knowledge of the investigation, I believe that CAMPBELL directed that VEIGA meet him at 22 Staples Shore Road in Lakeville, Massachusetts, and VEIGA responded that he would be there in 35 minutes ("I'll be over there in 35 minutes").  I believe that VEIGA further confirmed that CAMPBELL wanted 700 pills ("You want the seven?") and CAMPBELL affirmed ("Yeah.").

57.    Consistent with the above conversation regarding the timing of the meeting between CAMPBELL and VEIGA, at 10:30 a.m. that morning, an agent observed a black BMW bearing Massachusetts registration 2DWJ98 (the "Black BMW"), and registered to VEIGA, turn onto Staples Shore Road in Lakeville, Massachusetts.  The party driving the vehicle appeared to be VEIGA based on his Massachusetts driver's license photo.  At 11:09 a.m., agents observed the Black BMW back out of the driveway at 22 Staples Shore Road, Lakeville, Massachusetts.  Agents again observed a male driving the vehicle who appeared to be VEIGA based on VEIGA's license photo.  Location information for Target Telephone 2 showed that phone in the vicinity of 22 Staples Shore Road at the same time as agents made these observations of the driver of the BMW.

58.    At 10:48 a.m., agents conducting surveillance observed a blue GMC Sierra truck bearing Massachusetts registration 1MAL71 and registered to ATWOOD (the "Blue GMC Sierra") turn onto Staples Shore Road and shortly thereafter pull into the driveway of 22 Staples Shore Road, Lakeville, Massachusetts. At 10:52 a.m., agents observed ATWOOD's Blue GMC Sierra exit the driveway and head in the direction of Route 495.  In addition, location data for ATWOOD's phone showed that phone in the vicinity of 22 Staples Shore Road at the time that the Blue GMC Sierra was observed at this residence.

59.    Based on my training and experience, and knowledge of the investigation, I believe that VEIGA and CAMPBELL met at 22 Staples Shore Road, Lakeville, Massachusetts, and VEIGA supplied drugs to CAMPBELL.  The short nature of VEIGA's visit to this address is

consistent with an illegal drug transaction.    Similarly, I believe that during ATWOOD's visit to 22 Staples Shore Drive, CAMPBELL distributed oxycodone pills to him that he had just obtained from VEIGA.  ATWOOD's short visit to the house is consistent with an illegal drug transaction.

*December 26, 2022 – ATWOOD Requested 1200-1300 Oxycodone Pills*

60.     On December 26, 2022, at 2:26 p.m., ATWOOD called CAMPBELL.  ATWOOD started the conversations by saying, "Yo, what's up?"  CAMPBELL asked, "Uh . . . what's you trying to get?"  ATWOOD responded, "12 or 13."  CAMPBELL responded, "Alright let me hit him up and see what up."  ATWOOD responded, "Alright."

61.     Based on my training and experience, and knowledge of the investigation, I believe that CAMPBELL asked ATWOOD what amount of oxycodone pills he sought ("what's you trying to get?")  I believe that ATWOOD requested 1200 to 1300 oxycodone pills ("12 or 13").  I believe that CAMPBELL told ATWOOD he had to check with his supplier ("let me hit him up"), and ATWOOD affirmed ("Alright.").

62.     I believe that CAMPBELL then contacted VEIGA to obtain the pills requested by ATWOOD.  Also on December 26, 2022, CAMPBELL texted VEIGA, "U gd Wends."  VEIGA responded, "Should be" and "Wat #."  CAMPBELL responded, "12 or 13."  VEIGA responded, "Lyk tomorrow nite."  Based on my training and experience, and knowledge of the investigation, I believe in these text messages that CAMPBELL asked if VEIGA would have pills on Wednesday ("U gd Wends").  I believe that VEIGA responded that he likely would have drugs ("Should be") and CAMPBELL stated that he wanted 1200 to 1300 oxycodone pills ("12 or 13"), which is the same amount requested by ATWOOD.  I believe that VEIGA advised he would let CAMPBELL know the evening of the next day ("Lyk tomorrow nite").

*February 16, 2023 – CAMPBELL Obtained Pills from VEIGA and Redistributed to ATWOOD*

63.     On February 16, 2023, at 8:58 a.m., CAMPBELL called VEIGA and said, "Yo, what's the word?" and "How many you have?"  VEIGA responded, "Whatever."  CAMPBELL said, "Alright I got you.  He's gonna hit me up when he wake up."  VEIGA said, "Let me know."  Based on my training and experience, and knowledge of the investigation, I believe in the above conversation that CAMPBELL called VEIGA for oxycodone pills ("How many you have?").

64.     At 10:26 a.m., CAMPBELL called ATWOOD and said, "You told me you was gonna be ready.  You gotta probably meet me in Lakeville."  ATWOOD said, "I'll be ready to leave my house in a half hour."  CAMPBELL then said, "Alright . . . I'll tell him to head out.  Alright."  ATWOOD said, "So you got the whole thing, right?"  CAMPBELL responded, "Yeah, yeah, yeah."   I believe that CAMPBELL called ATWOOD to tell him that he would be ready to supply oxycodone pills that CAMPBELL was going to obtain from VEIGA ("I'll tell him to head out.").  I believe that ATWOOD said that he wanted a full pack of oxycodone pills ("you got the whole thing, right?").

65.     At 10:28 a.m., CAMPBELL called VEIGA and said, "He said he's leaving his crib in 30 minutes . . . He's probably like 15 minutes away from uh, the Lakeville."  VEIGA then said, "The Lakeville, the same one you . . . you were selling?"  CAMPBELL said, "Yeah, yeah, yeah."  VEIGA then said, "So the whole 18 or what?"  CAMPBELL responded, "Yeah, yeah, yeah." I believe that CAMPBELL told VEIGA that ATWOOD was leaving his house in 30 minutes ("he's leaving his crib in 30 minutes").  I believe that VEIGA confirmed that he and CAMPBELL were meeting at 22 Staples Shore Drive, Lakeville, Massachusetts, which CAMPBELL was renovating at the time ("The Lakeville, the same one you . . . you were selling?").  I believe that, consistent with CAMPBELL's earlier conversation with ATWOOD, VEIGA confirmed that he should bring 1800 pills for ATWOOD ("So the whole 18 or what?").

66.     At 11:21 a.m., ATWOOD called CAMPBELL and said, "Yo so . . . you're gonna go there."  CAMPBELL said, "Yeah, 22 Staples Shore.  I'm over here."  I believe that in this call, CAMPBELL told ATWOOD to meet him at 22 Staples Shore Drive, Lakeville, Massachusetts ("Yeah, 22 Staples Shore.  I'm over here.").

67.     At 11:17 a.m., an agent observed ATWOOD's Blue GMC bearing leaving the vicinity of his residence on Marks Way in Carver, Massachusetts.  Target Location # 3 is 25 Marks Way, Carver, Massachusetts.  At 11:55 a.m., CAMPBELL texted ATWOOD and said, "And u short 40 bucks."  ATWOOD responded, "It comes to 50 and 1/2 and one was missing 20 and one is missing 10 so that's why they're was 530."  ATWOOD responded, "So if you're saying it's 40 off you going to check and make sure it wasn't sticking together."  I believe that CAMPBELL told ATWOOD he was short $400 ("u short 400 bucks.").  I believe that ATWOOD said he provided only $5,300 dollars ("that's why they're was 530") because CAMPBELL had provided fewer oxycodone pills ("one was missing 20 and one is missing 10").

68.     At 12:13 p.m., agents conducting surveillance observed ATWOOD's Blue GMC Sierra pull into the driveway of 182 Glen Charlie Road, Wareham, Massachusetts (Target Location # 5).  At 12:20 p.m., agents observed the Blue GMC Sierra leave the driveway.

69.     Based on the context of the above calls, I believe that VEIGA supplied oxycodone pills to CAMPBELL at 22 Staples Shore Drive, Lakeville, Massachusetts that CAMPBELL then supplied to ATWOOD during a meeting at 22 Staples Shore Drive, Lakeville, Massachusetts.  I also believe based on surveillance that ATWOOD brought the oxycodone pills back to 182 Glen Charlie Road, Wareham, Massachusetts (Target Location # 5).

*February 28, 2023 – VEIGA Contacted CAMPBELL to Distribute Oxycodone Pills*

70.     On Tuesday, February 28, 2023, at 10:45 a.m., VEIGA texted CAMPBELL, "Ya mans not ready soon?"  CAMPBELL responded, "Idk u got a lot."  VEIGA responded, "Yea in like hr or 2."

71.     At 11:04 a.m., CAMPBELL then texted ATWOOD, "My man said he just got some."  ATWOOD responded, "I can take some on Thursday because I'm busy tomorrow."

72.     Based on my training and experience and knowledge of the investigation, I believe that in the above text messages, VEIGA asked CAMPBELL if CAMPBELL was ready to receive oxycodone pills for CAMPBELL to redistribute to ATWOOD ("Ya mans not ready soon?").  I believe that CAMPBELL then inquired how many pills VEIGA had available ("U got a lot") and VEIGA indicated that he would be ready to supply CAMPBELL in one to two hours ("in like hr or 2.").  I believe that CAMPBELL texted ATWOOD immediately thereafter to tell ATWOOD that VEIGA ("my man") had oxycodone pills ("he just got some") that CAMPBELL could supply to ATWOOD.

*March 2, 2023 – CAMPBELL Obtained Pills from VEIGA and Redistributed to ATWOOD*

73.     On March 2, 2023, at 12:51 p.m., CAMPBELL called ATWOOD and said, "What time are you gonna be ready at?"  ATWOOD responded, "How many can you get?"  CAMPBELL said, "I can get . . . What you want? 12? 13?"  ATWOOD said, "Oh fucking . . . just do the 13."  CAMPBELL said, "Alright, so how long is gonna take you to get to the Lake?"  ATWOOD said, "Fucking, uh, say half an hour, then a half an hour, so say an hour."

74.     At 12:52 p.m., CAMPBELL called VEIGA and said, "Yeah, he just hit me, said he could be over at 2:00."  VEIGA said that he would call CAMPBELL back ("I'mma call you right back.").  At 12:58 p.m., VEIGA called CAMPBELL back and said, "Hey, yo, 2:00 is good for me."  Based on CAMPBELL's call to VEIGA immediately after CAMPBELL talked to

26

ATWOOD, I believe that CAMPBELL called VEIGA to obtain oxycodone pills for redistribution to ATWOOD ("he just hit me"). I believe that they both agreed to meet at 2 p.m. ("Hey, yo, 2:00 is good for me.").

75. At 1:03 p.m., agents conducting surveillance observed ATWOOD leave his residence at 25 Marks Way, Carver, Massachusetts (Target Location # 3), driving the Blue GMC Sierra. Other agents conducting surveillance observed CAMPBELL leave a house that they believe he was working on (given the other evidence that he "flips houses") at 1:06 p.m. in the Gray Chevy Silverado. At 1:28 p.m., other agents observed VEIGA driving the Black BMW on Whiting Street in Whitman, Massachusetts, which is near his residence. At 1:37 p.m., agents observed ATWOOD in the driveway at 182 Glen Charlie Road in Wareham, Massachusetts (Target Location # 5). At 1:46 p.m., agents observed ATWOOD driving the Blue GMC Sierra on Route 25-West. At 1:48 p.m., agents observed the Gray Chevy Silverado arrive at 22 Staples Shore Road, Lakeville, Massachusetts. At 1:58 p.m., agents observed VEIGA's Black BMW arrive at 22 Staples Shore Road, Lakeville, Massachusetts, where it parked in the garage. At 2:04 p.m., agents observed ATWOOD's Blue GMC Sierra arrive at 22 Staples Shore Road, Lakeville, Massachusetts, and park in the driveway.

76. Agents observed CAMPBELL exit the residence, while carrying a package. CAMPBELL approached the Blue GMC Sierra. Agents could not see from their vantage point the transaction between CAMPBELL and ATWOOD, but at 2:20 pm., agents observed CAMPBELL return to the residence, while carrying a bag and no longer carrying the package. ATWOOD's Blue GMC Sierra then left 22 Staples Shore Road, Lakeville, Massachusetts. Agents followed him back to 182 Glen Charlie Road, Wareham, Massachusetts (Target Location # 5). On the way back to the residence, ATWOOD stopped at a Shell Gas Station. At 2:31 p.m., agents observed VEIGA's Black BMW leaving 22 Staples Shore Road, Lakeville, Massachusetts and followed the

vehicle.  At 3:03 p.m., agents observed VEIGA's Black BMW driving in the vicinity of his residence at 6 Hunters Path, Whitman, Massachusetts (Target Location # 2).  At 3:10 p.m., agents observed the Black BMW parked in the driveway of the residence.

77.    Based on my training and experience, I believe that on March 2, 2023, ATWOOD and CAMPBELL agreed to conduct a drug deal.  I believe that CAMPBELL called VEIGA to obtain oxycodone pills for ATWOOD.  I believe that VEIGA brought oxycodone pills to 22 Staples Shore Road, Lakeville, Massachusetts.  I believe that CAMPBELL delivered these oxycodone pills in the package he was seen carrying to ATWOOD's Blue GMC Sierra.  I believe that ATWOOD provided cash to CAMPBELL, which was inside the bag agents saw CAMPBELL carrying back into the residence.  I believe that CAMPBELL then paid VEIGA.  I believe that ATWOOD brought the oxycodone pills back to 182 Glen Charlie Road, Wareham, Massachusetts given that agents observed him travel directly to this location from 22 Staples Shore Road, Lakeville, Massachusetts.[21]  I believe that VEIGA brought the drug proceeds provided by CAMPBELL back to his residence at 6 Hunters Path, Whitman, Massachusetts (Target Location # 2) given that his vehicle was observed at VEIGA's residence after the deal with CAMPBELL.

**CAMPBELL – ATWOOD**

78.    In addition to the drug deals described above involving CAMPBELL, ATWOOD and VEIGA, intercepted calls and text messages, and surveillance, show that CAMPBELL and

---

[21] Shortly after this deal, I believe that ATWOOD obtained a new telephone assigned phone number xxx-xxx-7387 (the "7387 Number").  On March 7, 2023, CAMPBELL received a text message from this number, "It's M this is my new number so delete the other one."  I believe "M" refers to ATWOOD's first name, Michael.  I believe that this is ATWOOD's new number because after March 7, 2023, CAMPBELL's toll records show no contacts with ATWOOD's old number.  However, according to CAMPBELL's toll records, CAMPBELL and ATWOOD have maintained contact with ATWOOD using the 7387 Number. For example, between May 13, 2023 and June 11, 2023, there were 51 calls or text messages between CAMPBELL and ATWOOD's new number.

ATWOOD have engaged in the Target Offense (without simultaneous involvement by VEIGA), as described below.

*December 3, 2022 – CAMPBELL Distributed 700 Oxycodone Pills to ATWOOD*

79.    On December 3, 2022, at 10:33 a.m., CAMPBELL texted ATWOOD, "Yo be ready at 12."  CAMPBELL also texted, "Smalls."  At 11:56 a.m., ATWOOD called CAMPBELL and said, "So . . . I'm on the way, but I'm on the way there, it takes me like 15 minutes."  At 12:00 p.m., CAMPBELL called ATWOOD and said, "The five for the 34 and I'm gonna do the rest for . . . the two for . . . the 33."    Based on my training and experience, and knowledge of the investigation, I believe that CAMPBELL told ATWOOD to be ready for 12 p.m. ("Be ready at 12") and he told him the oxycodone pills would be small-sized ("Smalls").  I believe that ATWOOD said that he was 15 minutes away ("it takes me like 15 minutes") at 11:56 a.m.  I believe that CAMPBELL said that he was charging $34 per pill for 500 pills ("five for the 34") and $33 for 200 pills ("two for . . . the 33").

80.    At 12:19 p.m., an agent observed the Blue GMC Sierra pull into the driveway at 182 Glen Charlie Road, Wareham, Massachusetts (Target Location # 5).  At 12:27 p.m., CAMPBELL texted ATWOOD, "5min" and ATWOOD responded, "K." At 12:30 p.m., CAMPBELL texted ATWOOD, "Here."  An agent observed the Gray Chevy Silverado pull into the driveway at 182 Glen Charlie Road.  At 12:31 p.m., an agent observed CAMPBELL's vehicle leaving the residence and head towards the highway nearby.

81.    Based on the above calls and text messages, as well as surveillance, I believe that on December 3, 2022, CAMPBELL distributed 700 oxycodone pills to ATWOOD at 182 Glen Charlie Road, Wareham, Massachusetts (Target Location # 5).

*June 2023 – CAMPBELL and ATWOOD Continues to Engage in Drug Trafficking*

82.     As described in the footnote included above, there is probable cause to believe that CAMPBELL and ATWOOD continue to engage in drug trafficking with one another.  Between May 13, 2023 and June 11, 2023, there were 51 calls or text messages between CAMPBELL and ATWOOD's new number.  I believe, based on the nature of the phone calls and surveillance described above, that these calls and text messages relate to drug trafficking, and therefore there is probable cause to believe that CAMPBELL and ATWOOD continue to engage in the Target Offense.

**CAMPBELL – VEIGA**

83.     In addition to the drug deals described above involving CAMPBELL, ATWOOD and VEIGA, intercepted calls and text messages, and surveillance, show that CAMPBELL and VEIGA have engaged in the Target Offense (without simultaneous involvement by ATWOOD), as described below.

*March 14, 2023 – CAMPBELL and VEIGA Texted About Obtaining Oxycodone Pills*

84.     On March 14, 2023, at 1:17 p.m., VEIGA texted CAMPBELL, "Ya man comin this week?"  CAMPBELL responded, "Should."  VEIGA then texted, "Aight jus lmk . . . let him kno there's like 5-10 bigs in each pack this time around."

85.     Based on my training and experience, and knowledge of the investigation, I believe that CAMPBELL texted VEIGA to see if ATWOOD was going to be looking for pills ("Ya man comin this week?").  I believe that VEIGA said that his supplier had in fact come to the Boston area and that the supplier had provided packages of oxycodone pills that contained between five

and ten large ("bigs") oxycodone pills in each package ("There's like 5-10 bigs in each pack this time around.").[22]

86.     The next day, March 15, 2023, at 12:17 p.m., CAMPBELL texted VEIGA, "5 mins" and then at 12:18 p.m., CAMPBELL texted VEIGA, "8 mins." I believe that these texts show that CAMPBELL and VEIGA met on March 15, 2023 and CAMPBELL first indicated that he was five minutes from VEIGA's location ("5 mins") and then stated that he was eight minutes from VEIGA's location ("8 mins."). I believe that CAMPBELL and VEIGA met on March 15, 2023 for a drug deal given the text messages between them on March 14, 2023 in which CAMPBELL sought more oxycodone pills from VEIGA.

*May 24, 2023 – CAMPBELL and VEIGA Discussed Oxycodone Deal for $29 Per Pill*

87.     On May 24, 2023, at 11:52 a.m., VEIGA texted CAMPBELL, "Yoyo ima grab 3-4 in a couple shits real slow if want em lmk but price 29 on these ones." CAMPBELL then called VEIGA at 11:52 a.m. and said, "You talking about hundo?" VEIGA responded, "Yeah, just hundred. That's all I can grab right now." VEIGA then said, "Yeah, is like three or four hunnit" At 1:03 p.m., CAMPBELL texted, "K lmk if def I have to go to bank if u want to do it in am or tonight."

88.     Based on my training and experience and knowledge of the investigation, I believe that in these texts and calls, VEIGA told CAMPBELL that he could sell him oxycodone pills for $29 apiece ("lmk but price 29 on these ones."). I believe that VEIGA told CAMPBELL he had 300-400 pills on hand ("Yeah, is like three or four hunnit.") that he was selling in denominations

---

[22] This call supports the probable cause to believe that ▇▇▇▇▇▇ is VEIGA's oxycodone supplier. As explained below, on March 13, 2023, ▇▇▇▇▇▇ flew to Logan Airport and surveillance showed ▇▇▇▇▇▇ and VEIGA meeting in the early hours of March 14, 2023. VEIGA's text message to CAMPBELL suggesting that he had packages of oxycodone pills containing 10-15 larger pills each, combined with the communications between ▇▇▇▇▇▇ and VEIGA described below, and the surveillance of ▇▇▇▇▇▇ and VEIGA before the texts with CAMPBELL, provides probable cause to believe that ▇▇▇▇▇▇ is VEIGA's oxycodone supplier.

of 100 ("Yeah, just hundred."). I believe that CAMPBELL indicated that he would withdraw cash to pay for the oxycodone pills ("lmk if def I have to go to bank."). Based on interceptions after this text, I do not believe VEIGA and CAMPBELL actually met for a drug deal on May 24, 2023 or May 25. 2023, but I do believe (as described below) that they met up on May 27, 2023 for a drug deal.

89.     On May 27, 2023, at 10:55 a.m., CAMPBELL called VEIGA. VEIGA said, "How many do you want? Cause I'ma . . . my other people just hit me up a little while ago. Say they might have a couple of boats." CAMPBELL responded, "I may grab a couple of boats man. I may grab whatever you get." VEIGA then said, "A'ight. I'm just tryna make . . . cause you know niggas all been bullshitting." I believe that VEIGA told CAMPBELL that he had other re-distributors who contacted him ("my other people") about obtaining a few thousand oxycodone pills ("a couple of boats"). I believe that CAMPBELL indicated that he would buy a few thousand oxycodone pills ("I may grab a couple of boats man.").

90.     At 2:54 p.m., CAMPBELL called VEIGA and said, "How many do you have, the two?" VEIGA responded, "I got two. Yeah." CAMPBELL said, "We gonna do that. What time should I tell him to head down." VEIGA said, "So yeah, I'm just gonna head towards Taunton, so send me the addie" CAMPBELL said, "Just type in, Taunton BJ's." Based on my training and experience, I believe that CAMPBELL indicated that he wanted 2000 oxycodone pills ("the two"). I believe that CAMPBELL indicated to VEIGA that he was going to re-distribute the pills that he obtained from VEIGA to another party ("What time should I tell him to head down."). I believe that CAMPBELL told VEIGA to meet him at the BJ's Wholesale Club in Taunton, Massachusetts ("Just type in, Taunton BJ's.").

91.     At 3:24 p.m., agents monitoring the pole camera in the vicinity of CAMPBELL's residence at 53 Woodview Drive, Taunton, Massachusetts (Target Location # 1), observed the

Gray Chevy Silverado depart the driveway of the residence.  At 3:35 p.m., CAMPBELL texted VEIGA, "park onside."  At the same time, location information for VEIGA's Target Telephone 2 showed the phone in the vicinity of the BJ's Wholesale Club at 2085 Bay Street, Taunton, Massachusetts.  At 3:38 p.m., VEIGA texted CAMPBELL, "I'm 2 cars to ya lefy." At 3:39 pm., CAMBELL called VEIGA and VEIGA said, "I'll hop in with you, right now."  I believe that CAMPBELL instructed VEIGA to park on the side of the BJ's Wholesale Club ("park onside").  I believe that VEIGA indicated that he had parked two cars to the left of CAMPBELL ("I'm 2 cars to ya lefy") and I believe that VEIGA got into CAMPBELL's vehicle ("I'll hop in with you, right now").  At 4:04 p.m., the pole camera in the vicinity of CAMPBELL's residence showed the Gray Chevy Silverado arrive back in the driveway of CAMPBELL's residence.  I believe based on the intercepted communications between May 24 and 27, 2023 discussed above, the location information from VEIGA's phone and the pole camera footage, that VEIGA supplied oxycodone pills to CAMPBELL when they were inside CAMPBELL's vehicle at the BJ's Wholesale Club parking lot.[23]

*June 2023 – CAMPBELL and VEIGA Continue to Engage in Drug Trafficking*

92.     There is probable cause to believe that CAMPBELL and VEIGA continue to engage in drug trafficking with each other.  Toll records show that between June 2, 2023 and June 11, 2023, CAMPBELL and VEIGA called or texted with each other 22 times.  Put another way, on average, it appears that they spoke with one another on more than one occasion each day during this period of time.  Given the interceptions described above, there is probable cause to believe

---

[23]  There is probable cause to believe that CAMPBELL re-distributed oxycodone pills to ATWOOD after this meeting with VEIGA.  Tolls records show that on May 27, 2023, at 3:42 p.m. CAMPBELL called the 7387 Number that I believe ATWOOD now uses.  There was also an incoming call on CAMPBELL's toll records at 3:43 p.m.  I believe based on the timing of these calls and the investigation, that these calls related to CAMPBELL distributing oxycodone pills to ATWOOD.

that these calls and text messages concern the Target Offense, and that they continue to engage in the Target Offense.

## CAMPBELL - LAMBERT

93.     As described above, on February 24, 2023, agents stopped LAMBERT's vehicle after he met with CAMPBELL and seized 73 oxycodone pills from that vehicle.  Prior to this seizure, intercepted calls and surveillance show that CAMPBELL and LAMBERT conducted two oxycodone deals described below.

*December 5, 2022 – CAMPBELL Distributed 117 Oxycodone Pills to LAMBERT*

94.     On December 5, 2022, I believe that CAMPBELL supplied LAMBERT with oxycodone pills on the Access Road in Taunton, Massachusetts.  Prior to the meeting, on December 5, 2022, at 5:57 p.m., LAMBERT called CAMPBELL and said, "Can I come see you in about an hour?"  CAMPBELL responded, "Yeah."  LAMBERT said, "Alright, I need 117."  CAMPBELL responded, "Alright."  Based on my training and experience, and knowledge of the investigation, I believe that LAMBERT requested 117 oxycodone pills from CAMPBELL ("I need 117"), which CAMPBELL agreed to provide ("Alright.").  At 7:45 p.m., LAMBERT texted CAMPBELL, "Here," and CAMPBELL responded "5min."

95.     Also around 7:45 p.m., agents observed on a pole camera, a small white SUV (the "White SUV")[24] arrive on the Access Road and turn off its lights.  At 7:49 p.m., agents observed the Gray Chevy Silverado arrive on the Access Road and park next to the White SUV.  After a few moments, the Gray Chevy Silverado pulled away and left the Access Road.  As the Gray Chevy Silverado left the Myles Standish Industrial Park (near the Access Road)], agents confirmed the plate number on the vehicle as CAMPBELL's vehicle.  At 7:52 p.m., pole camera footage showed

---

[24]  Agents were not able to positively identify the make and model of the White SUV, but I know that the Toyota RAV4 is a small SUV, and the White SUV was therefore likely the White RAV4 used by LAMBERT in other drug transactions.

the White SUV leave the Access Road.  Agents in the area then surveilled it to the parking lot of Brack's Grille & Tap in Taunton, Massachusetts.  Agents observed LAMBERT get out of the driver's door of the White SUV briefly, and then get back into the vehicle.  Agents then observed LAMBERT drive the White SUV to a nearby Wendy's parking lot, where LAMBERT stopped his vehicle and approached the driver of a Kia sedan (the "Kia Sedan").  This interaction was brief. LAMBERT then returned to his vehicle.  Both vehicles departed the area and surveillance was terminated.

96.     Based on my training and experience, and knowledge of the investigation, I believe that CAMPBELL supplied oxycodone pills to LAMBERT on the Access Road, and that LAMBERT then re-distributed oxycodone pills to a person inside the Kia Sedan.  The brief nature of LAMBERT and CAMPBELL's meeting, the use of the Access Road and the timing of this meeting relative to the order for 117 pills, are factors consistent with an illegal drug deal.  In addition, I believe that LAMBERT delivered oxycodone pills to a person in the Kia Sedan because this occurred immediately after the meeting with CAMPBELL and this meeting was short, which are factors consistent with an illegal drug deal.

*February 19, 2023 – CAMPBELL Distributed Oxycodone Pills to LAMBERT on Access Road*

97.     On February 19, 2023, at 5:15 p.m., LAMBERT texted CAMPBELL, "Can I come see you bro?"  CAMPBELL responded, "Yea."  At 5:24 p.m.,  LAMBERT texted CAMPBELL, "OMW, #12"   CAMPBELL responded, "K."    At 6:44 p.m., LAMBERT texted CAMPBELL, "Getting off."  At 6:44 p.m., CAMPBELL texted, "Here."  Based on my training and experience, I believe that in these text messages, LAMBERT asked CAMPBELL for oxycodone pills ("can I come see you bro?") and CAMPBELL replied he could supply LAMBERT ("Yea").  I believe LAMBERT requested 120 oxycodone pills ("#12").  Agents monitoring a pole camera on the Access Road observed a vehicle parked on the Access Road ("Vehicle #1").  Given the time of

day, agents could not determine the make and model of the car.  Agents did observe the vehicle turn off its lights.  Within a few moments, agents observed a small SUV (the "Small SUV") pull onto the Access Road and pull next to Vehicle #1.  Seconds later, both vehicles departed the area.

98.     Based on my training and experience, and knowledge of the investigation, I believe that CAMPBELL supplied LAMBERT with oxycodone pills on the Access Road.  I believe that they conducted a drug deal given the text messages immediately before the meeting, given that CAMPBELL regularly uses the Access Road to conduct oxycodone deals, and given that LAMBERT has used the White RAV4, which is a small SUV like the one observed on the pole camera.

## VEIGA – ███████ – GONSALVES

99.     As stated above, the investigation has showed that ███████ supplies oxycodone pills to VEIGA.  The investigation has further showed, as described above, that VEIGA supplies CAMPBELL, who frequently supplied ATWOOD immediately after meeting with VEIGA.  In addition to CAMPBELL, VEIGA also supplies GONSALVES with oxycodone pills obtained from ███████     The relationships and drug trafficking activities of ███████ VEIGA and GONSALVES are discussed below.

*February 16, 2023 –* ███████ *Traveled to Boston to Deliver Oxycodone Pills to VEIGA*

100.     According to records from United Airlines, on February 15, 2023, ███████ flew from Houston, Texas to Boston, Massachusetts departing Houston at 6:28 p.m., and arriving in Boston at 10:53 p.m.  United records also show that ███████ returned to Houston on February 16, 2023, departing at 3:15 p.m. and arriving back in Houston at 7:26 p.m.[25]

101.     I believe that ███████ came to Boston to meet with VEIGA.  Surveillance from further meetings between ███████ and VEIGA confirms that they are engaged in a drug

---

[25] Departure and arrival times are based on local time.  Houston, Texas is central standard time.

conspiracy.  Moreover, agents intercepted a call on February 16, 2023 consistent with the two men

having met when ████ was in Boston.  Not long before ████ departure from Boston

that day, at 1:17 p.m., ████ called VEIGA and said, "You told Dylan that I ran across Cash

Boy?"   VEIGA responded, "Nigga, I just told him right now, but I told him . . . I told him . . . I

told him don't say shit to nobody."  VEIGA also stated, "Literally, I just told him like two minutes

ago." ████ said, "You definitely said something."  VEIGA responded, "So what?  The dude

hit you up or something?" ████ responded, "Yeah, he hit me up on the insta."  VEIGA said,

"This nigga told me . . . it's cause . . . this nigga told me that he was going on a 3:30 flight.  I said,

'Oh, this nigga, they are going on the same one.'" ████ responded, "I'm telling you bro not

to say nothing to him bro." ████ further stated, "Just leave it at that.  Don't say nothing else

bro," and "Okay, bro, if you talk to him my bro, just don't say nothing about it.  Nothing on the

business side."  VEIGA then said, "Nah, nah.  I didn't talk about no business, but I asked him, I

was like, yo, I was like yo, your nigga be bringing other shit, too?  And he was, yeah been told

you?" ████ stated, "Okay, bro, if you talk to him my bro, just don't say nothing about it.

Nothing on the business side."

102.    Based on my training and experience, and this investigation, I believe that this

conversation shows that ████ and VEIGA had just been together. ████ indicated that

they had discussed ████ seeing Cash Boy ("You told Dylan that I ran across Cash Boy?").

I believe that in the above conversations, ████ admonished VEIGA for discussing drug

trafficking with "Dylan."   I know based on my training and experience, that drug traffickers are

very wary of details about their drug trafficking getting disclosed for fear that other drug traffickers

could "rip" them off or that law enforcement could detect their illicit activities.  I believe that

VEIGA affirmed that he had talked to "Dylan," but he also said that he told "Dylan" not to tell

anyone else ("I told him don't say shit to nobody.").  I believe that VEIGA inquired if Dylan had

called or texted ██████ ("the dude hit you up or something"), and that ██████ said that Dylan had contacted ██████ via Instagram ("on the insta."). I believe that VEIGA told ██████ that VEIGA insisted that all he told "Dylan" was that ██████ was traveling on a 3:30 p.m. flight like someone that "Dylan" knew ("this nigga told me that he was going on a 3:30 flight . . . they are going on the same one."). I believe that ██████ instructed VEIGA not to tell "Dylan" any further information ("Just leave it at that. Don't say nothing else bro."). I believe that ██████ told VEIGA not to talk to "Dylan" about drug trafficking, i.e. the "business" ("Nothing on the business side."). I believe that "Dylan" could be D.F.[26]

103.    Chase Bank records show that while ██████ was in Boston, he made substantial cash deposits. I believe that such banking activity is consistent with ██████ and VEIGA meeting, ██████ supplying oxycodone pills to VEIGA and VEIGA paying cash to ██████ for the oxycodone pills. On February 16, 2023, ██████ made three large cash deposits at the same Chase ATM on Salem Street in Boston. One deposit was for $16,200 into an account in the name of 1000 & Son Freight LLC ending in 8876, which is an account for which Chase records show ██████ holds signatory authority.

104.    A second deposit was for $13,500 into an account in the name of 1000 Auto Sales LLC ending in 1273, which is an account for which Chase records show ██████ holds signature authority.

---

[26] I know the full identity of D.F. I believe that this could be D.F. based on other evidence in this investigation. For example, on December 3, 2022 and December 10, 2022, CAMPBELL's vehicle was seen on surveillance visiting the apartment complex in Randolph, Massachusetts that lease documents show is the residence of D.F. In addition, based on intercepted calls combined with surveillance on December 10, 2022, agents determined that D.F. was intercepted over Target Telephone 1 and agents also observed D.F. and CAMPBELL meeting that day. In addition, Zelle records for ██████ show that D.F. regularly sent ██████ cash through Zelle on many occasions in 2021. For example, on August 2, 2021, D.F. made four separate Zelle payments to ██████ each in the amount of $1,000. The movement of such substantial quantities of funds from D.F. to ██████ suggests that like VEIGA, ██████ supplies oxycodone pills to D.F. D.F. is currently on supervised release in this Court after pleading guilty to distribution of fentanyl in 2019 (Docket Number 18-CR-1-263-GAO).

105.    Chase records further show that at the same ATM, that same day, ████████ made another cash deposit of $9,900 into his personal account ending in 2875.

106.    Based on my training and experience, and knowledge of the investigation, I believe that these cash deposits were drug proceeds.  I know from my training and experience, that drug traffickers frequently conduct their business exclusively in cash and that it is not uncommon for them to deal in thousands of dollars at a time like the ATM cash deposits made by ████████ Furthermore, based on the intercepted call discussed above, between ████████ and VEIGA, the timing of these deposits suggest that they are drug proceeds.  I believe that ████████ came to Boston to supply oxycodone pills to VEIGA, and therefore, the approximately $26,100 that he deposited in total at Chase is consistent with payment he received from VEIGA for the drug proceeds.  Moreover, given the inherent risks in carrying such a high quantity of cash on one's person, I believe that it is unlikely that ████████ traveled from Houston to Boston carrying this amount of cash and instead it is probable that he obtained the cash while in Boston.[27]

*February 16, 2023 – VEIGA Offered Oxycodone Pills to GONSALVES*

107.    After meeting with ████████ VEIGA offered oxycodone pills to GONSALVES, which further shows that ████████ had supplied VEIGA.  Moreover, as described below, VEIGA and GONSALVES even discussed the specific pills supplied by ████████ At 2:42 p.m., VEIGA

---

[27] Information from Chase reveals other cash transactions by ████████ that are, based on my training and experience, consistent with drug trafficking.  For example, on March 9, 2021, ████████ visited the Chase Branch at 425 Washington Street, Boston, Massachusetts and initiated a cash deposit of $16,000.  When the bank teller advised ████████ that such a cash deposit would prompt the filing of a Currency Transaction Report (CTR) with the government, ████████ reduced the deposit to $8,000, below the CTR threshold of $10,000.  Meanwhile, Chase records show that on June 26, 2022, ████████ deposited cash in three separate transactions of $4,000, $4,000, and $2,000 at the Chase ATM located at 345 Harrison Avenue, Boston, Massachusetts into the 1000 and Son Freight LLC account.  Such cash transactions broken into denominations less than $10,000 are consistent, in my training and experience, with structuring cash transactions to avoid having to report the transactions to the government.

received a call from GONSALVES, who was using telephone number xxx-xxx-3004.[28]  VEIGA said, "I got a good mix.  So, I was just seein if you wanted it."  GONSALVES responded, "Yeah, yeah, yeah, I probably got like 16 bands, just give me a little bit to . . . give me like a day to um . . . force it out real quick."  GONSALVES stated, "You know me, bro.  I got ALGs so I can mix it." VEIGA further stated, "Yeah, I got ALGS and K9s and shit . . . There is something else but I gotta good mix for you."

108.    I believe that in the above conversation, VEIGA called GONSALVES to offer oxycodone pills ("I got a good mix. So, I was just seein if you wanted it.").  I believe that GONSALVES affirmed that he wanted drugs in a few days and that he had $16,000 to purchase the pills ("Yeah, yeah, yeah, I probably got like 16 bands, just give me a little bit to . . . give me like a day to um . . . force it out real quick.").  I believe that VEIGA said that he had a variety of different kinds of oxycodone pills, including ones marked with K9 and ALG ("I got ALGS and K9s and shit . . . There is something else but I gotta good mix for you.").

109.    I believe that GONSALVES and VEIGA then met on February 18, 2023 for VEIGA to supply oxycodone pills to GONSALVES.    On February 17, 2023, at 8:09 p.m., GONSALVES called VEIGA and stated, "I should be ready for tomorrow, I got 21 bands exactly." VEIGA responded, "Just let me know then." VEIGA then indicated, "But SHORTY should be coming next week, too, so . . . there should be another good mix coming."  Based on my training and experience, and knowledge of the investigation, I believe that in this call, GONSALVES indicated that he was paying $21,000 to VEIGA for the oxycodone pills ("I got 21 bands exactly."). I believe that VEIGA indicated that he would have oxycodone pills ("another good mix") the

---

[28]  Agents identified GONSALVES as the user of telephone number xxx-xxx-3004, based on telephone records showing him as the subscriber for this phone number.  Subsequently, agents confirmed GONSALVES as the user of the number based on the timing and substance of intercepted calls, combined with surveillance, as described herein.  Unless otherwise noted, all calls to/from GONSALVES referenced herein were over telephone number xxx-xxx-3004.

following week after VEIGA received pills from SHORTY ("[b]ut SHORTY should be coming next week too").[29]

<em>February 16, 2023 Trip – Other Evidence of ███████ Involvement</em>

110.    There is other evidence that ██████ had just supplied VEIGA.  In addition to the call with GONSALVES, on February 16, 2023, at 10:23 a.m., VEIGA received a call from xxx-xxx-1303, which I believe is used by J.M. (whose full identity I know) based on telephone subscriber information.  VEIGA started the conversation with, "Listen, you don't want nothing?" J.M. responded, "Of course I do.  What's the word?"  VEIGA then responded, "How many you want?  I got whatever you need, bro."  J.M. stated, "Okay, okay, okay.  What are they?  ALG's and shit."  VEIGA responded, "Uh, my man just sold me like a mix but mostly Ms but . . . there is K9 and ALG's."

111.    Based on my training and experience and knowledge of the investigation, I believe that VEIGA initiated this call with J.M. because ██████ had just supplied him ("Listen, you don't want nothing?")  I believe that VEIGA indicated that ██████ ("my man") had supplied him with a variety of different kinds of oxycodone pills ("I got whatever you need" and "a mix but mostly Ms but . . . there is K9 and ALG's").  I know from my training and experience that "M," "K-9" and "ALG" are common imprints on oxycodone pills.  Based on the timing and substance of this call, especially in relation to a similar call with GONSALVES discussed above, I believe that ██████ supplied VEIGA with oxycodone pills when he flew to Boston on February 16, 2023.

---

[29] As described below, agents identified SHORTY when she came to Boston with ██████ on May 10, 2023, and I believe (also described below) that he stated on an intercepted call that she works for him.

*March 13, 2023 –* ▮▮▮▮ *Supplied Oxycodone Pills to VEIGA*

112.    About one month later, ▮▮▮▮ returned to Boston and again met with VEIGA to supply him with oxycodone pills.  According to United Airlines records, ▮▮▮▮ departed from Houston at 6:15 p.m. on March 13, 2023, arriving in Boston at 10:49 p.m.   On March 14, 2023, ▮▮▮▮ flew back to Houston from Boston at 2:18 p.m., arriving at 4:29 p.m.

113.    Agents established surveillance at Logan Airport on the evening of March 13, 2023. At 11:01 p.m., agents observed ▮▮▮▮ (identified through a photograph) leaving the gate area for United Flight #1617, which arrived at Terminal B of Logan Airport.   Agents observed ▮▮▮▮ then get onto an escalator to the lower level of Terminal B, exit the terminal building and get onto a Logan Airport bus.   ▮▮▮▮ wore a black bucket-style hat, black pants, and a multi-colored top, and he was carrying a backpack (the "▮▮▮▮ Backpack").

114.    While ▮▮▮▮ was waiting at the curb for the rental car bus, surveillance video showed him with a roller-style suitcase (the "Rolling Suitcase") in addition to the ▮▮▮▮ Backpack.   The bus carrying ▮▮▮▮ then traveled to the Logan Airport Rental Car Center, where agents observed ▮▮▮▮ exit the bus and enter the rental car center.  Agents observed ▮▮▮▮ approach the Avis Car Rental desk.  Shortly thereafter, agents observed ▮▮▮▮ get into his rental car, a gray Toyota Tacoma pickup truck bearing Ohio registration OAFC53 (the "Gray Toyota Tacoma").  Agents continued surveillance of ▮▮▮▮ got onto Route 93-South.  Agents followed ▮▮▮▮ as he exited from Route 93 onto Route 95-South.  Agents then observed the Gray Toyota Tacoma appearing to drive in tandem with a dark-colored SUV (the "Dark SUV").  Agents were not able to positively identify the registration for the Dark SUV. Agents observed the Gray Toyota Tacoma and the Dark SUV take exit 27B and make a left onto Norton Road in Canton, Massachusetts.  Both vehicles then parked in front of the first house to the right on Norton Road.  Agents observed ▮▮▮▮ standing outside the Gray Toyota Tacoma

speaking to a black male who was seated in the driver's seat of the Gray Toyota Tacoma.   Based on my training and experience, the short nature of this interaction between ▮▮▮▮▮ and the driver of the Dark SUV is consistent with a drug transaction. ▮▮▮▮▮ was with this individual for just a few moments, and they met on a side street off the highway.   Neither man was seen entering any house on the street.   Together these factors are consistent with this meeting being an illegal drug transaction.

115.    Shortly thereafter, at 12:19 a.m. on March 14, 2023, agents observed the Gray Toyota Tacoma, driven by ▮▮▮▮▮ pull away and get onto Route 95-South.  Agents continued surveillance of ▮▮▮▮▮ who, at 1:02 a.m. exited Route 95 and drove into the Twin Rivers Casino Resort in Lincoln, Rhode Island. ▮▮▮▮▮ parked the Gray Toyota Tacoma and entered the casino carrying the ▮▮▮▮▮ Backpack.  On March 14, 2023, at 1:09 a.m., VEIGA called ▮▮▮▮▮ VEIGA stated, "I'm parked all the way in the back.  Let me try to get to the front." VEIGA further stated, "You are the what?" and ▮▮▮▮▮ responded, "The north side."  VEIGA stated, "Yeah, I'm at the north parking lot right now."  VEIGA then stated, "Oh I see you.  I see your truck right there, yup." ▮▮▮▮▮ then stated, "I'm standing outside so, you got everything you need, man?" and then added, "I'm having a real day . . . they gave me a rental car with no tail light."  VEIGA then stated, "Yo hold on.  Facetime me real quick, so I make sure I am going on the right way."  Based on my training and experience and knowledge of the investigation, I believe that in the above phone call, VEIGA and ▮▮▮▮▮ attempted to locate each other, specifically so that ▮▮▮▮▮ could supply oxycodone pills to VEIGA.

116.    Around the same time as this call, agents observed a white Acura bearing Massachusetts registration 3BCK18 (the "White Acura"), and registered to a female identified as E.D. (whose full identity I know) park in the lot near the Gray Toyota Tacoma.  Agents observed VEIGA exit the White Acura while carrying a large red backpack (the "Large Red Backpack").

At 1:16 a.m., agents observed VEIGA and ██████████ standing together at the front desk of the Twin River Resort.  After VEIGA and ████████ finished at the front desk, agents terminated surveillance.  Thereafter, agents obtained video from the hotel that showed ████████ and VEIGA enter a hotel room at 1:25 a.m. (according to the timestamp on the surveillance video), while still carrying their respective backpacks (and ████████ with the Rolling Suitcase).  Both men remained in the room for about one and a half hours as surveillance video showed them leave the room at 2:54 a.m.

117.   Records from Twin River show that ████████ rented a room that night.  Based on my training and experience, I know that drug traffickers will use hotel rooms to conduct drug deals because they are not in public view where criminal activity can be detected.  I believe that ████████ met to supply oxycodone pills to VEIGA.  ████████ likely carried the oxycodone pills in his luggage (the ████████ Backpack or the Rolling Suitcase).  I know based on my training and experience that drug traffickers utilize various mechanisms to hide drugs in suitcases.  I also believe that VEIGA's Large Red Backpack may have contained money for oxycodone pills that he supplied to ████████ when they met inside the hotel.[30]

118.   Surveillance video from Bank of America shows that on March 14, 2023, at 4:10 a.m., ████████ visited a Bank of America ATM in Brookline, Massachusetts, and deposited a large quantity of cash into the ATM.  Agents are awaiting business records from Bank of America confirming the amount of this deposit.

---

[30] ████████ and VEIGA had two calls on April 8, 2023 at 12:06 a.m. and 12:27 a.m. Based on my training and experience and knowledge of the investigation, I believe that considering ████████ trip to Boston on April 7 and April 8, 2023, these continued contacts are drug related.  I believe that ████████ may have come to Boston on April 7, 2023 to supply oxycodone pills to VEIGA, and that VEIGA and ████████ talked to arrange a drug deal.

119.     Moreover, later that day, on March 14, 2023, VEIGA advised CAMPBELL that he had just been re-supplied with oxycodone pills consistent with ████ re-supplying VEIGA with oxycodone pills during their meeting at Twin River Casino.  On March 14, 2023, at 1:17 p.m., VEIGA texted CAMPBELL, "Ya man comin this week?"  CAMPBELL responded, "Should."  VEIGA then texted, "[L]et him kno there's like 5-10 bigs in each pack this time around."  Based on my training and experience, and knowledge of the investigation, I believe that VEIGA texted CAMPBELL to see if CAMPBELL's redistributor was ready for pills ("Ya man comin this week?").  I believe that VEIGA advised CAMPBELL that ████ had just supplied VEIGA ("this time around") with large-sized oxycodone pills ("There's like 5-10 bigs in each pack.").

*May 9-10, 2023 – ████ Accumulated Drugs Before Trip to Boston*

120.     United Airlines records show that on May 10, 2023, ████ flew from Houston to Boston, departing at 6:40 p.m., and arriving in Boston at 11:30 p.m.   United records further show that ████ traveled with A.E. (whose full identity I know).  Before leaving for Boston the evening of May 10, 2023, intercepted calls show that ████ picked up numerous prescriptions, consistent with him supplying drugs to VEIGA when they met in the early morning hours of May 11, 2023.

121.     On May 9, 2023, at 3:16 p.m., an unknown male, using xxx-xxx-9893 ("UM9893") called ████ and said, "I can't lose my source, you feel what I am saying?  And you one of my sources."  ████ stated, "A'ight Brisk.  Let me know cause my people from out of town and they wanna . . .so just."  Based on my training and experience, and knowledge of the investigation, I believe during this call, UM9893 indicated that he obtains drugs from ████ ("And you one of my sources.").  I believe ████ advised UM9893 to tell him what oxycodone pills he wanted ("let me know") because ████ was arranging to bring pills to VEIGA in Boston ("cause my people from out of town.").  Earlier, at 2:48 p.m., ████ called UM9893,

who stated, "I know for sure I want my blues.  That's what I got my bread for."  I believe that during this call, UM9893 indicated that he sought oxycodone pills from ▮▮▮▮ ("my blues") and that he had money ("I got my bread") for the oxycodone pills.

122.    On May 10, 2023, at 3:12 p.m., ▮▮▮▮ called UM9893 and indicated that he had to pick up drugs at more than one pharmacy, consistent with him accumulating drugs to bring to VEIGA.  During this call, UM9893 told ▮▮▮▮ "I was to trying to hit you to meet you." ▮▮▮▮ stated, "Alright.  Just tell me . . . when I get ready." ▮▮▮▮ also stated, "Alright, do you want me to come to you now or you want me to wait or you want me to wait until you get situated?" ▮▮▮▮ said, "I still gotta pick up at my other pharmacy."  Based on my training and experience, and knowledge of the investigation, in this call, I believe that ▮▮▮▮ and UM9893 were arranging a time to meet ("I was trying to you to meet you") and ("do you want me to come to you now or you want me to wait").  I believe ▮▮▮▮ indicated that he was picking up drugs at more than one pharmacy, consistent with him obtaining a substantial quantity of oxycodone pills to bring to Boston for his meeting with VEIGA.  About ten minutes later at 3:22 p.m., ▮▮▮▮ called UM9893 again and said, "I have to go the pharmacy real quick and pick up my other shit real quick then I'll hit you."  Based on my training and experience, I believe that ▮▮▮▮ told UM9893 that he was going to the pharmacy to pick up drugs ("pick up my other shit.").

123.    About ten minutes later, at 3:32 p.m., ▮▮▮▮ received a call from xxx-xxx-4853 believed to be used by an unknown male referred to as "Nite" on intercepted calls ("UM4853"). ▮▮▮▮ stated, "You're leaving the pharmacy yet or what?"  UM4853 responded, "I already left.  I'm 20 minutes away." ▮▮▮▮ told UM4853, "Alright.  Um, I'm 18 minutes away."  I believe that in this call UM4853 traveled to the pharmacy to get drugs for ▮▮▮▮ ("you're leaving the pharmacy") and they later met for UM4853 to supply drugs to ▮▮▮▮ ("I'm 20

minutes away") and ("I'm 18 minutes away").  Again, I believe based on the earlier call at 3:22 p.m. that ▮▮▮▮▮ not only had UM4853 picking up prescriptions for him, but ▮▮▮▮▮ himself was picking up prescriptions.

124.    At 4:26 p.m., ▮▮▮▮▮ called xxx-xxx-1602, used by an unknown male ("UM1602") and said, "What you got over there?  You got some blues?"  UM1602 said, "Shit, getting rid of it now."  ▮▮▮▮▮ said, "You gettin' rid of.  What you getting' ride of them for?"  UM1602 stated, "Quarter."  ▮▮▮▮▮ stated, "Alright, I was gonna tell you.  I'll take 'em up there. I'll be back tomorrow for 27."  ▮▮▮▮▮ also asked UM1602, "How much you want for the Somas?"  Agents were not able to hear UM1602's response to this question.

125.    In the above call, I believe that ▮▮▮▮▮ asked UM1602 for oxycodone pills ("you got some blues").  I believe UM1602 said that he had oxycodone pills that he could sell for $25 apiece ("Quarter") and ▮▮▮▮▮ indicated that he would take the oxycodone pills to Boston ("I'll take them up there") and that ▮▮▮▮▮ would sell the pills for $27 apiece ("I'll be back tomorrow for 27.").  I believe that ▮▮▮▮▮ then inquired about the Schedule IV controlled substance carisoprodol ("how much you want for the Somas?"), as I know based on my training and experience that Soma is a trade name for this drug, which is a muscle relaxant that is heavily abused in combination with other drugs.[31]  ▮▮▮▮▮ flight departed at 6:40 p.m. on May 10, 2023.  These calls all occurred within the hours immediately before ▮▮▮▮▮ flight.  Based on the content of the calls, I believe ▮▮▮▮▮ was accumulating prescription drugs, and as described below, given that ▮▮▮▮▮ met with VEIGA as soon as he landed in Boston, I believe that ▮▮▮▮▮ distributed to VEIGA oxycodone pills that he had just acquired that afternoon.

---

[31] On May 9, 2023, ▮▮▮▮▮ offered Somas to UM9893 ("I got some Somas.").  UM9893 declined the drugs ("Oh . . . I can't do nothin' with that.").

*May 10, 2023 – VEIGA and GONSALVES Discussed* ▮▮▮▮ *Trip to Boston*

126.    On May 10, 2023, at 12:09 pm., GONSALVES called VEIGA.  VEIGA stated, "Yeah, fucking, my man is tapped in with me.  He says he is coming late night, though.  So, I'd probably have to leave shit with my brother or some."  GONSALVES then asked, "Come in it late, late, late night?"  VEIGA responded, "Yeah, yeah.  He usually comes nigga, then we usually be done like 2-3 in the morning, nigga."  GONSALVES stated, "Two or three in the morning, nigga?"  VEIGA stated, "Yeah, that's what happens nigga, said he be touching down like 12.  And then I got wait for him to check in and all that bullshit.  And then nigga we go count it and its usually at 2-3 we be done, nigga."[32]  VEIGA then stated, "It'll be, it will probably be just on my brother or some.  So you aint gotta worry."  VEIGA further stated, "Yeah, I just have to break him off a little bread or something.  That's alright.  He'll do it for me."  VEIGA stated, "Nah, nah, nah . . . this nigga might not come.  I know this nigga, bro.  I'm gonna call him at 5 or 6 and see whats the word with him.  So, I'll let you know by then."  GONSALVES stated, "alright, word."  I believe based on my training and experience that in the above call, VEIGA indicated to GONSALVES that ▮▮▮▮ was flying to Boston on the evening of May 10, 2023 ("He is coming late night though.").  I believe that VEIGA indicated that he would leave the drugs supplied by ▮▮▮▮ with VEIGA's brother ("I'd probably have to leave shit with my brother or some.").  I believe GONSALVES asked if ▮▮▮▮ came late at night ("Come in it late, late, late night?").  I believe VEIGA said that ▮▮▮▮ comes late at night, and they met until between 2 a.m. and 3 a.m. ("Yeah . . . then we usually be done like 2-3 in the morning.").  I believe that VEIGA said ▮▮▮▮ plane would land at 12 a.m. ("He be touching down like 12") and that VEIGA had to

---

[32] This statement further supports the probable cause to believe that VEIGA obtained oxycodone pills on March 14, 2023 during the meeting at Twin River given that, as described above, surveillance cameras showed the two men departing the hotel room at 2:54 a.m. consistent with VEIGA's statement that they finishing counting the oxycodone pills between 2 and 3 a.m. ("[U]sually at 2-3 we be done, nigga.").

wait for ▌▌▌▌▌ to check in at the hotel ("And then I got wait for him to check in.").  I believe

VEIGA then said that his brother would have the oxycodone pills to be re-distributed to

GONSALVES ("[I]t will probably be just on my brother") and I believe that VEIGA indicated he

would call ▌▌▌▌▌ between five and six p.m. to confirm that he was coming to Boston ("I'm

gonna call him at 5 or 6 and see what's the word with him.).[33]

    *May 10-11, 2023 – ▌▌▌▌▌ Traveled to Boston to Supply Oxycodone Pills to VEIGA*

    127.    The evening of May 10, 2023, agents established surveillance at Logan

International Airport.  At 11:53 p.m., agents observed (and surveillance video showed) ▌▌▌▌▌

and A.E. (identified by photograph) exit the United gate area, walk outside and get onto a Logan

Rental Car shuttle bus.

    128.    ▌▌▌▌▌ wore a black shirt and a blue hat.  He carried a blue backpack and also

had a small tan rolling suitcase with him.  A.E. wore a green shirt and tan pants.  At 12:02 a.m.

(now May 11, 2023), VEIGA called ▌▌▌▌▌ told VEIGA, "Just landed."  VEIGA

then stated, "A'ight.  What you about to do?  You about to link up with me out here or you want

me to go out there?"  ▌▌▌▌▌ responded, "I gotta get a rental car."  ▌▌▌▌▌ and VEIGA then

discussed hotels where ▌▌▌▌▌ could stay.  Towards the end of the call, VEIGA asked, "Who

you coming with . . . Shorty?"  ▌▌▌▌▌ responded, "Yeah," and "My mule.  Aight let me call

Encore."

    129.    Based on my training and experience, and knowledge of the investigation, I believe

that in this call, VEIGA called ▌▌▌▌▌ to arrange to meet to obtain oxycodone pills that

▌▌▌▌▌ had brought with ▌▌▌▌▌ ("You about to link up with me out here or you want me

to go out there?").  I believe that VEIGA asked if "Shorty," whom I believe is a co-conspirator of

---

[33] Based on other intercepted calls, I believe that VEIGA told GONSALVES that VEIGA's brother would
have the oxycodone pills for GONSALVES because VEIGA was traveling out of town after meeting with
▌▌▌▌▌ early in the morning of May 11, 2023.



███████ was coming with ███████ ("Who you coming with Shorty?"). I further believe that Shorty refers to A.E., who had flown to Boston with ███████ I believe that ███████ indicated that she works for him, as I know, based on my training and experience, that "mule" is common slang to refer to individuals who transport drugs ("My mule").

130.    At 12:25 a.m., agents observed ███████ and A.E. at the Budget Rent A Car desk. Within a short time, ███████ and A.E. were observed leaving Logan in a blue Infiniti bearing New York registration LAL1943 (the "Blue Infiniti"). At 12:32 a.m., an agent observed the White Acura leaving 7 Stewart Drive, Abington, Massachusetts ("Target Location # 6).[34] Agents surveilled ███████ who was driving the Blue Infiniti, to the Homewood Suites in Brookline, Massachusetts, where he arrived at 1:20 a.m. At 1:25 a.m. agents observed the White Acura also arrive at Homewood Suites. VEIGA exited the driver's seat of the vehicle and greeted ███████ and A.E. outside of the hotel. The three individuals entered the hotel briefly and then returned to the parking lot. At 1:38 a.m., VEIGA and ███████ returned inside the hotel, while A.E. got back into the front passenger seat of the Blue Infiniti. ███████ carried a backpack with him into the hotel.[35] At 2:04 a.m., agents intercepted a call from ███████ to a female using telephone number 832-306-7665 whom I believe based on the context of the call to be A.E. ███████ stated, "Hey you wanna come up here so I can use that App." A.E. stated, "You gonna have to find somewhere to park this in 15 minutes." VEIGA then could be heard (in the background)

---

[34] Earlier in the evening of May 10, 2023, agents observed VEIGA exit Building # 7 (7 Stewart Drive, Abington, Massachusetts) (Target Location # 6) and enter the Black BMW. Agents followed VEIGA to a different apartment complex where he exited the Black BMW with a red backpack and entered an apartment unit at 8:22 p.m. At 9:22 p.m., VEIGA left this apartment. VEIGA then drove from that apartment complex to 6 Hunters Path, Whitman, Massachusetts (Target Location # 2), where he stayed for approximately 13 minutes. At 9:49 p.m., VEIGA drove from 6 Hunters Path back to 7 Stewart Drive, Abington, Massachusetts (Target Location # 6).

[35] As described above, agents observed ███████ carrying a backpack with him as he exited his flight at Logan Airport. I believe that ███████ likely carried the same backpack into the hotel, but based on agents' vantage point, I cannot say for certain that it was the same backpack.

saying, "Nobody gonna touch you.  Is late night in Boston.  Nobody is gonna touch that shit."  A.E. asked, "What's room number?"  ███████ responded, "305."  I believe that in this call ███████ asked A.E. to come to ███████ hotel room ("305") to bring his cellphone so he could using a counting app to count the pills that he supplied to VEIGA ("Hey you wanna come up here so I can use that App.").[36]  I believe this called confirms that ███████ and VEIGA were in fact meeting in the hotel.

131.    At 3:51 a.m., agents observed VEIGA, ███████ and A.E. exit the hotel.  VEIGA carried a plastic bag in his right hand and ███████ carried the same backpack observed when he entered the hotel.  VEIGA got into the White Acura and drove away.  ███████ got into the driver's seat of the Blue Infiniti and A.E. got into the front passenger seat.  Agents followed ███████ as he drove away and went to a Citgo gas station in Brookline.  ███████ briefly entered the gas station convenience store and then drove to the Bank of America ATM located at 225 Washington Street, Brookline, Massachusetts and parked the Blue Infiniti in front of the ATM. Agents observed ███████ enter the lobby of the ATM machine.  While agents did not maintain constant surveillance on ███████ they remained in the general vicinity of the ATM and drove by approximately five minutes after ███████ entered the ATM, and observed that he was no longer in the ATM lobby and the Blue Infiniti was gone.  Surveillance video from the Bank of America ATM shows ███████ depositing what appears to be large sums of cash into the ATM.

---

[36]  Based on a subsequent call from ███████ on May 19, 2023I believe that this call concerned a pill-counting app.  That day at, at 5:36 p.m., ███████ called an unknown male using 281-714-9893 ("UM9893"), whom, I believe based on other calls as discussed in this affidavit, is a drug trafficker to whom ███████ provides drugs.  ███████ stated, "Hey you got big bills, bro?  Or you got little bills? Like . . . cause Imma use the app to out the pills.  Did you put the app on your phone?  Or no?"  I believe that the CAMPBELL told UM9893 that he was going to use the pill-counting app to count the pills that was going to provide to UM9893 ("Imma use the app to count out the pills") in exchange for the cash provided by UM9893 for the drugs ("you got big bills . . . or you got little bills").

132.     Based on my training and experience, and knowledge of the investigation, I believe that ▮▮▮▮▮▮ visited the Bank of America ATM to deposit cash that he had just obtained from VEIGA in exchange for oxycodone pills ▮▮▮▮▮ provided to VEIGA.

*Intercepted Calls Show Money Laundering By* ▮▮▮▮▮▮▮

133.     As described above, bank records show that immediately after meeting with VEIGA, ▮▮▮▮▮▮ made significant cash deposits at ATMS in the Boston area.  Based on my training and experience, I believe that these cash deposits consist of drug proceeds.  As described below, intercepted calls show that ▮▮▮▮▮ is using his bank accounts to launder drug proceeds, which is further evidence of his involvement in the Target Offense.

134.     For example, on May 7, 2023, at 10:08 p.m., ▮▮▮▮▮ called an unknown male using phone number xxx-xxx-0917 ("UM0917").  ▮▮▮▮▮ advised UM0917 that his bank account had been "closed down" and that his funds were frozen because he conducted too many deposits.  ▮▮▮▮▮ added that he normally stays "under 95."  UM0917 advised ▮▮▮▮▮ that he could get "audited," but ▮▮▮▮▮ could account for his money because he has a "clean business."  ▮▮▮▮▮ expressed skepticism, saying that he did not think his business was "enough," and he wondered what an audit might say.

135.     I know based on the investigation that Chase Bank did in fact close down ▮▮▮▮▮ personal bank account.  I believe that ▮▮▮▮▮ indicated that he normally only deposits amounts of cash under $10,000 ("under 95") because I know from training and experience that cash transactions over $10,000 require a bank to report the transaction to the government.  I believe that ▮▮▮▮▮ sought to keep deposits under $9,500 because the money he deposited was drug money, and he did not want his activities detected by the bank or law enforcement authorities. I believe that UM0917 indicated that ▮▮▮▮▮ could wash his drug proceeds through ▮▮▮▮▮ freight/trucking company ("clean business") (also held at Chase) and therefore avoid

scrutiny by authorities. I believe that ███████ acknowledged that he was using his business to launder drug proceeds (his comment that he did not think his business was enough), and that ███████ further expressed concern about authorities' scrutiny of his banking activities.

136.   Similarly, on May 11, 2023, at 1:05 a.m., ███████ called xxx-xxx-4436, which is a telephone number that I believe is used by J.W. (whose full identity I know) based on CashApp subscriber information. I believe that ███████ advised J.W. that he had just arrived in Boston ("Just landed . . . just got the rental car."). ███████ further stated, "As soon as I get in the hotel I'ma call you. I'ma spend an extra day just so I can move the money the right way." J.W. stated, "Right." ███████ stated, "Yeah, yeah, yeah, I'ma fuck with the business account though. I ain't gonna fuck with my personals." J.W. stated, "A'ight."

137.   I believe that in the above call ███████ acknowledged to J.W. that he intended to launder drug proceeds through his business bank account and not his personal accounts ("I'ma fuck with the business account though. I ain't gonna fuck with my personals.). I know, based on training and experience, that drug traffickers and money launderers will use business bank accounts to launder their drug proceeds to make the drug money look "clean" and as if it relates to a legitimate business, and to avoid scrutiny from law enforcement.

**VEIGA – GONSALVES**

138.   In addition to the deals described above between VEIGA and GONSALVES that also involved ███████ as described below, there were several other deals between VEIGA and GONSALVES (without simultaneous involvement by ███████ that show their involvement in the Target Offense.

*March 6, 2023 – VEIGA Supplied GONSALVES with At Least 40 Oxycodone Pills*

139.   On March 6, 2023, at 3:10 p.m., VEIGA called GONSALVES and said, "Shit, I remixed this morning. But yeah, there is probably be like 40 bigs." GONSALVES responded,

"Alright."   VEIGA then said, "There's only five to ten yellows in each one.  Not even a lot." GONSALVES said, "That's cool.  I like those.  They like those" and further added, "As long as there is blue, that's it, man."  VEIGA responded, "Yeah, yeah I did that . . . there is some white in there though."  GONSALVES then asked, "No, I am saying, what Ms?  There is a lot of Ms?" VEIGA stated, "Um . . .no.  Well's that's what I am saying the one that I remixed out nigga, I remixed like 10-15 out of each . . . I put like 10-15 in each one.  Like ALG extra."  GONSALVES stated, "I'll take yellows over Ms all day."

140.    I believe that in the above conversation VEIGA told GONSALVES that he had mixed 40 large-sized pills ("probably like 40 bigs") within a larger mixture of various kinds of oxycodone pills ("I remixed this morning").  I believe that VEIGA indicated there were between five and ten yellow-colored oxycodone pills in each bag ("There's only five to ten yellows in each one.").  I believe that GONSALVES said he liked yellow oxycodone pills ("I like those") and his customers like them, as well ("They like those.").   I believe GONSALVES also reiterated that he liked blue-colored oxycodone pills ("As long as there is blue, that's it, man.").  I believe VEIGA said that there were white oxycodone pills ("[T]here is some white in there though.").  I believe that GONSALVES then asked if VEIGA had oxycodone pills with an "M" imprint (which I know is a common imprint on certain oxycodone pills) ("There is a lot of Ms?").  I believe that VEIGA stated that he mixed 10-15 of each variety of oxycodone pills in each bag ("I remixed like 10-15 out of each . . . I put like 10-15 in each one") and I believe that VEIGA indicated that he put additional oxycodone pills marked "ALG" ("Like ALG extra.").[37]  I believe that GONSALVES

---

[37] According to a Massachusetts State Police report, during a motor vehicle stop on January 16, 2022, troopers found three bags of 30-milligram oxycodone pills imprinted with "ALG 265" and "30" in GONSALVES's pocket during a search of him incident to arrest.

indicated that he preferred yellow-colored oxycodone pills over oxycodone pills marked with an "M" ("I'll take yellows over Ms all day.").[38]

141.     Agents conducting surveillance that day believe that VEIGA and GONSALVES met to conduct a drug deal consistent with the intercepted communications described above. Location information for Target Telephone 2 showed this phone in the vicinity of 6 Hunters Path, Whitman, Massachusetts at 4:04 p.m. (Target Location # 2).  At 4:19 p.m., location data showed Target Telephone 2 in the vicinity of Massachusetts Route 106 East in West Bridgewater, Massachusetts.  Location data immediately thereafter showed the phone traveling southbound towards Fall River, Massachusetts.  At 4:50 p.m., an agent established surveillance around 116 Broadway, Fall River, Massachusetts (Target Location # 4), which is the residence of GONSALVES.   At 4:56 p.m., the agent observed VEIGA's Black BMW parked in the back of 116 Broadway, Fall River, Massachusetts.  The agent then observed VEIGA exit the driver's seat of the vehicle, and enter 116 Broadway, Fall River, Massachusetts through a back door after knocking on the door.  At that point, surveillance was terminated.  Location data for Target Telephone 2 showed the phone in the vicinity of 116 Broadway, Fall River, Massachusetts.  Based on this surveillance and the intercepted calls described above, I believe that VEIGA traveled to 116 Broadway, Fall River, Massachusetts, to supply GONSALVES with oxycodone pills.

*May 4, 2023 – VEIGA Distributed 800 Oxycodone Pills to GONSALVES*

142.     On May 3, 2023, at 7:32 p.m., GONSALVES called VEIGA and said, "What's good though, how you looking, what's good, how's the packs?"  VEIGA responded, "I only got 8 left."  Based on my training and experience and knowledge of the investigation, I believe that in this call, GONSALVES asked VEIGA if he had oxycodone pills ("how's the packs?").  I believe

---

[38]  I know based on my training and experience that oxycodone pills come in a variety of colors and sizes, which informs my belief that the references to colors in this conversation between GONSALVES and VEIGA relate to oxycodone pills.

that VEIGA said that he had 800 pills ("I only got 8 left.").  VEIGA also stated, "I know there's a

whole of K9 pack."  Based on my training and experience and knowledge of the investigation, I

believe that during this call, GONSALVES inquired about obtaining oxycodone pills ("how's the

packs?") and that VEIGA said that he had 800 pills ("I only got 8 left") and that the pills included

oxycodone pills marked K-9 ("a whole of K9 pack").  Later, GONSALVES called VEIGA back

at 8:24 p.m. to confirm that they were meeting tomorrow.  GONSALVES stated, "[Y]ou could see

me tomorrow after work.  It don't matter.  I know how you get so."  VEIGA responded, "Yeah . .

. nah, it could wait 'til tomorrow honestly.  I'm not in no rush for nothing."  GONSALVES then

stated, "Yeah, I'll be . . . literally be ready."  I believe that in this call GONSALVES and VEIGA

agreed to meet the next day ("see me tomorrow after work") and ("it could wait 'til tomorrow").

143.    On May 4, 2023, agents established surveillance in the area of GONSALVES's

residence at 116 Broadway, Fall River, Massachusetts (Target Location # 4) and in the area of

VEIGA's residence on Forsyth Drive, Abington, Massachusetts. (Target Location # 6).[39]  At 4:48

p.m., an agent observed the Black BMW in the parking lot of The Point at Abington Condominium

Complex in Abington, Massachusetts.  The agent conducting surveillance then left this area.  At

5:17 p.m., the agent returned and noticed that the Black BMW was no longer in the parking lot.

At 6:12 p.m., VEIGA called GONSALVES and said that he would be at GONSALVES's location

in ten minutes ("I'll be there in like 10 minutes.").

144.    At 6:25 p.m., agents observed the Black BMW pull into a driveway immediately

behind 116 Broadway, Fall River, Massachusetts (Target Location # 4).  Agents then observed a

Toyota Camry also pull behind 116 Broadway, Fall River, Massachusetts.  Agents observed

VEIGA exit the driver's door of the Black BMW.  VEIGA wore a black hoodie and gray

---

[39] As described below, there is probable cause to believe that VEIGA maintains two residences in
Whitman, Massachusetts and Abington, Massachusetts.  Further as set forth below, there is probable
cause to believe that both residences contain evidence of the Target Offense.

sweatpants, and carried a bag in his left hand.  Agents also observed a male exit the Toyota Camry who appeared to be GONSALVES based on a photograph.  The two men walked into 116 Broadway, Fall River, Massachusetts.  Agents then terminated surveillance.  Based on this surveillance and the intercepted calls described above, I believe that VEIGA traveled to 116 Broadway, Fall River, Massachusetts, to supply GONSALVES with oxycodone pills.

*June 2023 – VEIGA and GONSALVES Continue to Engage in Drug Trafficking*

145.    Telephone toll records show further contacts between VEIGA and GONSALVES in June 2023.  Between June 1, 2023 and June 8, 2023, VEIGA and GONSALVES have called each other on eight occasions.  Given the intercepted calls discussed above, there is probable cause to believe that VEIGA and GONSALVES have continued to engage in drug trafficking with each other and have continued to use their phones in the commission of the Target Offense.

## TARGET LOCATIONS

### ***Description and Criminal Activity at Target Locations***

*CAMPBELL's Residence – Target Location #1*

Description of Target Location

146.    53 Woodview Drive, Taunton, Massachusetts ("Target Location # 1") is a single-family, split-level style home.  This residence is furnished with beige/tan-colored siding and red shutters.  The front door is red and is accessed by one or two steps.  To the left of the front door is picture-style window appearing to be on the main level of the residence, and to the right of the front door, there are two windows appearing to be on the main level of the residence.  There are also a series of windows located on the front portion of the house that appear to be on the lower or basement level of the house.  These windows are obstructed in part by shrubs.  There is a chimney on the left side of the residence.  The roof is brown and is furnished with two skylight-style windows.

147.     I believe that CAMPBELL resides here for several reasons.     CAMPBELL's
Massachusetts license record lists Target Location # 1 as his residence.  As described above before
the controlled buys on July 7, 2022, July 14, 2022, August 9, 2022 and August 30, 2022,
surveillance showed that CAMPBELL left from Target Location # 1 immediately before the
undercover buys.  According to North Bristol, Massachusetts Registry of Deeds, CAMPBELL
holds a mortgage on this property.  Target Location # 1 was also listed as CAMPBELL's address
on several Bank of America withdrawal slips in 2021.  In addition, Target Location # 1 is listed as
CAMPBELL's address on: a CashApp account in his name; an Eastern Bank account (account
ending in 2622); an Eastern Bank account (ending in 9420); an Equifax credit report; and a Lowe's
credit card (account ending in 0573).  On June 12, 2023, an agent conducting surveillance observed
the Gray Chevy Silverado in the driveway of Target Location # 1.  On June 24, 2023, pole camera
footage showed the Gray Chevy Silverado parked in the driveway of Target Location # 1.  In
addition, according to information from the United States Postal Service received on June 23,
2023, CAMPBELL is receiving mail at this address.

Link to Criminal Activity

148.     As described above, surveillance showed CAMPBELL leave Target Location # 1
before conducting four undercover buys in July 2022 and August 2022.  As described above, on
November 30, 2022, before distributing oxycodone pills to ATWOOD and on February 24, 2023,
before distributing to LAMBERT, surveillance showed CAMPBELL leaving Target Location # 1.
Moreover, more recently, on May 27, 2023, before and after the deal with VEIGA at the BJ's
Warehouse Club, pole camera footage showed CAMPBELL's Gray Chevy Silverado at Target
Location # 1.  Therefore, there is evidence of CAMPBELL departing from Target Location # 1
before drug deals and then returning to Target Location # 1 after the deals. Therefore, there is
probable cause to believe that CAMPBELL stores drug-related evidence at Target Location #1.

Based on my training and experience, I believe such items could include drug ledgers that list co-conspirators and witnesses, quantities of drugs sold and debts owed.  Other items could include scales used to measure drugs.  I also believe that CAMPBELL may keep drug packaging at his residence like bags and containers for the oxycodone pills.  This could include the packaging used by suppliers like VEIGA and ████████ but also the packaging that CAMPBELL uses before re-distributing oxycodone pills to individuals like ATWOOD and LAMBERT.  There also could be evidence related to storage of drug proceeds like a money counter and a safe, for example.   I also believe that despite any passage of time, such items will remain at Target Location # 1.  I know based on my training and experience that in some circumstances drug traffickers will not dispose of items related to their business in the trash for fear that law enforcement will detect their illicit activities.

149.    Moreover, CAMPBELL's long-term involvement in drug trafficking also provides probable cause to believe Target Location # 1 will include evidence of the Target Offense.  For example, according to a report from the Middleboro Police Department and CAMPBELL's criminal record, in 2016, he was convicted of trafficking in oxycodone and cocaine after officers executed a search warrant at his residence and seized 1,500 oxycodone pills, approximately 100 grams of cocaine, three pistols, two shotguns, a rifle, ammunition, and $30,000 in cash.[40] CAMPBELL's use of his residence in 2016 for drug trafficking and his continued involvement in drug trafficking provide probable cause to believe that he is using his current residence, Target Location # 1, related to drug trafficking.

---

[40] Based on my training and experience, I know that drug traffickers like the Target Subjects commonly possess firearms and ammunition as part of their drug trafficking activities.  Drug traffickers use guns to protect their drugs and drug proceeds, and to use them in the event someone attempts to rob them.  I believe based on my training and experience that given the common use of firearms and ammunition in the drug trade, possession of such items by drug traffickers can be evidence of the Target Offense.

*VEIGA's Residence 1 – Target Location # 2*

Description of Target Location

150.    6 Hunters Path, Whitman, Massachusetts is a single-family, two-story, colonial-style home.  The home is clad with off-white siding, with white trim and blue shutters.  The driveway is to the left of the residence.  There is a two-car garage off the driveway that includes a second story.  The front door is in the center of the residence and is accessed by two steps.  The "#6" appears on the trim to the right of the front door.  There are four windows on the first floor of the front side of the house.  The second floor includes ten windows on the front side of the house.  The front yard includes grass, shrubs and a white lamp post.  The home is located at the end of a cul-de-sac.

151.    I believe that VEIGA maintains a residence here for several reasons.  First, VEIGA's Massachusetts criminal record lists Target Location # 2 as his residence.   VEIGA's Massachusetts license record lists Target Location # 2 as his residence.  Agents have also observed VEIGA's vehicle at the residence on several occasions during the investigation.  On December 17, 2022, agents conducting surveillance observed VEIGA's Black BMW at the residence at 9:50 a.m.  On March 2, 2023 at 1:28 p.m. agents observed the Black BMW on Whiting Street leaving the area of Hunters Path for a meeting with CAMPBELL.  The Black BMW returned to Target Location # 2 after the meeting.  According to the Plymouth County, Massachusetts Registry of Deeds, VEIGA's mother holds a mortgage on this property.[41]  According to records for an Apple iCloud account in the name of VEIGA, Target Location # 2 is his address.  Target Location # 2 is also listed as VEIGA's address for a Bank of America credit card in his name (account ending in 7025), a Bank of America account (account ending in 9902), and a Citizens Bank account (account

---

[41] The person holding the mortgage is the same name listed as VEIGA's mother on his Massachusetts criminal record.

ending in 9450).   In addition, according to information from the United States Postal Service received on June 23, 2023, VEIGA is receiving mail at this address.[42]  On June 27, 2023, agents observed the Black BMW at Target Location # 2.

Link to Criminal Activity

152.   I believe that VEIGA uses Target Location # 2 in connection with the Target Offense.  First, on March 2, 2023, as described above, I believe that VEIGA went to Target Location # 2 after dropping off oxycodone pills to CAMPBELL that he then re-distributed to ATWOOD.  Therefore, it is probable that VEIGA uses this address to store drug proceeds as I believe he likely had cash with him from CAMPBELL for the drugs that he received.  I know from my training and experience that drug traffickers will keep ledgers to track drug debts and safes to hold cash at those locations where they store drug proceeds.  Moreover, on March 6, 2023, before meeting with GONSALVES to deliver oxycodone pills, I believe that VEIGA was at Target Location # 2.  Therefore, there is probable cause to believe that he stores drug paraphernalia, including packaging, baggies and scales that VEIGA may use for oxycodone pills that he distributes to individuals like CAMPBELL and GONSALVES.  Moreover, wiretap calls show that VEIGA also likely keeps drug proceeds at this location.  There is also probable cause to search this residence based on VEIGA's visit to it on the evening of May 10, 2023 before he met with ███████ in the early morning hours of May 11, 2023.

---

[42]  As described below, I believe that VEIGA is currently residing at 7 Stewart Drive, Abington, Massachusetts, with his girlfriend.  Nevertheless, I believe that Target Location # 2 will still contain evidence related to the Target Offense given VEIGA's history of drug trafficking, and that evidence like drug packaging items, drug ledgers and related records are not likely to be destroyed and are likely to be maintained at this location.  The probable cause discussed herein shows that VEIGA has used this residence for a long period of time in connection with his drug trafficking.  Moreover, as described herein, there is evidence that VEIGA continues to engage in the Target Offense, and therefore that related records will still be maintained at locations connected to VEIGA, including this one.

153.    On May 30, 2023, at 6:58 p.m., agents intercepted a call between VEIGA and an unknown male using 347-545-6697 ("UM6697").  During the call, VEIGA stated, "Yeah nigga.  I got 100 saved right in the fucking closet, bro.  And I got another fucking 50 at my girl's closet."  Based on my training and experience, and knowledge of the investigation, I believe that VEIGA told UM6697 that he has stored $100,000 in the closet of Target Location # 2 ("I got 100 saved right in the fucking closet, bro.) and that he has $50,000 stored in the closet of his girlfriend ("And I got another fucking 50 at my girl's closet.").[43]  I believe this conversation shows that VEIGA stores drug proceeds, i.e. $100,000, inside Target Location # 2.  And, again, I know from training and experience that drug dealers like VEIGA will maintain drug ledgers and other records to keep track of their business.  This type of evidence is not fleeting and therefore, I have reason to believe that it will still be inside Target Location # 2 despite the passage of time.

*ATWOOD's Residence – Target Location # 3*

Description of Target Location

154.    25 Marks Way, Carver, Massachusetts is a one-story, single-family, modular-style home.  The home has gray siding with white trim, with three windows and black shutters on the front of the residence.  The roof is covered with gray shingles.  There is a small front porch accessed by five steps that leads to the front door.  The number "25" appears on a white post on the front porch to the right of the front door.  The driveway is to the right of the residence.  The area immediately in front of the house is covered with gray rocks and a small lawn that includes a black lamp post.

---

[43] In this same call, I believe that VEIGA made other statements consistent with admissions that he is involved in drug trafficking.  VEIGA also stated, "Because what I'm doing nigga, I'm trying to get out of this shit . . . bro, I need to figure out how to make this shit legit."  I believe in this call VEIGA admitted that he wants to stop trafficking drugs ("I'm trying to get out of this shit") because drug trafficking is not legal and "legit" ("I need to figure out how to make this shit legit").

155.   I believe that ATWOOD resides here for several reasons.   ATWOOD's Massachusetts license record lists Target Location # 3 as his residence. The Blue GMC Sierra is registered to ATWOOD at Target Location # 3.  According to an insurance claim from January 7, 2022, Target Location # 3 is ATWOOD's residence.  Surveillance showed ATWOOD leaving from this residence to meet with CAMPBELL on February 16, 2023 and March 2, 2023.  On June 17, 2023, agents observed ATWOOD's Blue GMC Sierra parked in the driveway of this location. On June 26, 2023, an agent observed ATWOOD in the driveway of this location.  In addition, according to information from the United States Postal Service received on June 23, 2023, ATWOOD is receiving mail at this address.

Link to Criminal Activity

156.   As described above, immediately before conducting oxycodone deals with CAMPBELL on February 16, 2023 and March 2, 2023, agents observed ATWOOD leave Target Location # 3.  Moreover, before the deal on March 2, 2023, as described above, I believe, based on my training and experience, that during an intercepted call CAMPBELL admonished ATWOOD for being "short," i.e. not paying the correct price, for drugs during their last deal together.   For this reason, I believe ATWOOD likely pays CAMPBELL when he receives oxycodone pills from CAMPBELL.    Given that ATWOOD pays CAMPBELL at the time CAMPBELL supplies the oxycodone pills, and seeing that ATWOOD leaves Target Location # 3 immediately before the drug deals, there is probable cause to believe that he stores evidence related to the Target Offense at Target Location # 3.  This also include safes, money counters, as well as deposit slips or other records showing the disposition of cash by ATWOOD.  This could include cash that he uses to buy the drugs, and drug ledgers used to track his debts to suppliers like

CAMPBELL.[44]  In addition, toll records for CAMPBELL's phone shows that he has continued to maintain contact with ATWOOD since March 2023.

157.   Moreover, ATWOOD has a long history of drug trafficking.  His criminal record shows that in 2012, he was convicted of possession with intent to distribute a Class B substance and sentenced to 3-5 years in prison.  Also in 2012, ATWOOD was convicted of possession with intent to distribute a Class D substance – subsequent offense, and sentenced to 2.5 years in prison for that conviction.  ATWOOD was also previously convicted of possession with intent to distribute a Class D substance in 2008 and sentenced to one year in prison for that conviction. ATWOOD's long history of drug trafficking provides probable cause to believe that he continues to traffic drugs, and it also provides probable cause to believe that he continues to use Target Location # 3 for drug trafficking given his pattern of using that location during the course of this investigation.   I know from my training and experience that long-time drug traffickers will continuously use the same locations for the storage of drugs, drug paraphernalia and drug proceeds. Based on my training and experience, I know that drug traffickers like ATWOOD will not dispose of evidence of their illicit activities because they do not want law enforcement to find such evidence in the trash.

*GONSALVES's Residence – Target Location # 4*

<u>Description of Target Location</u>

158.   116 Broadway, Fall River, Massachusetts is a brick, row-style house.  The front of the residence includes a white front door and white storm door.  The roof is covered with red

---

[44] In addition to the drug deals described here in February 2023 and March 2023, I believe that CAMPBELL and ATWOOD conducted drug deals for at least several months before these particular deals. I believe based on surveillance that CAMPBELL and ATWOOD met on June 9, 2022 and June 22, 2022 for drug deals.  Location data for CAMPBELL's vehicle and surveillance of ATWOOD showed that CAMPBELL and ATWOOD's vehicles visited a secluded dirt road in Carver, Massachusetts at the same time, and left the area within a few moments.  The quick nature of these meetings, and the fact that they met on a secluded dirt road are, based on my training and experience, consistent with drug trafficking.

shingles.  The number "116" appears on a black mailbox hanging to the left of the front door.  The front door is to the far right of the front of the building and is accessed by four cement steps.  There are three windows on the first floor of the residence and four smaller windows on the second floor.  All of the windows are surrounded by white trim.  The front of the residence includes a small patio area surrounded by a cement fence.

159.    I believe GONSALVES resides here for several reasons.  The MSP Police Report for GONSALVES's arrest on January 16, 2022 listed Target Location # 4 as his residence.  GONSALVES's Massachusetts license record lists Target Location # 4 as his residence.  Agents conducting surveillance saw VEIGA enter Target Location # 4 on March 6, 2023 and on May 4, 2023, agents saw GONSALVES when he was conducting drug deals with VEIGA at Target Location #4.  On June 15, 2023 and June 26, 2023, an agent conducting surveillance observed a black Acura MDX, bearing Massachusetts registration and registered to GONSALVES (the "Black Acura") parked in a parking lot in the back of 116 Broadway, Fall River, Massachusetts.  The Black Acura is registered to GONSALVES at Target Location #4.  An insurance claim from August 1, 2019 shows this as GONSALVES's residence.    In addition, according to information from the United States Postal Service received on June 23, 2023, GONSALVES is receiving mail at this address.

Link to Criminal Activity

160.    On March 6, 2023, agents conducting surveillance observed VEIGA enter Target Location # 4 after he and GONSALVES set up a drug deal on Target Telephone 2.  Similarly, on May 4, 2023, agents observed VEIGA and GONSALVES enter Target Location #4 again after they set up a drug deal over Target Telephone 2.  Therefore, there is probable cause to believe that GONSALVES uses Target Location #4 for the Target Offense, including to store drug proceeds that he uses to pay VEIGA, and to store drug paraphernalia like packaging, scales, and similar

items, that are used after he receives oxycodone pills from VEIGA.  Moreover, GONSALVES's long-time history in drug trafficking provides further probable cause to believe that he continues to engage in the Target Offense, and that he continues to use Target Location # 4 as part of the Target Offense, despite any passage of time.   According to the MSP Police Report for GONSALVES's arrest in 2016. state troopers arrested him on Route 195 East in Fall River.  State troopers seized 32 grams of blue suspected oxycodone pills from GONSALVES during this arrest. Given that GONSALVES was arrested in Fall River, near his residence, there is probable cause to believe that he had been coming from his residence when troopers arrested him.  His long history of drug trafficking, combined with evidence that he has continued to use Target Location # 4 related to drug trafficking, provides probable cause for a search of this residence.  I believe based on my training and experience that there is probable cause to believe that records like ledgers, as well as baggies, scales and packaging inside Target Location # 4.  There also could be evidence related to storage of drug proceeds like a money counter and a safe, for example.   I believe given GONSALVES's long history of drug trafficking, that he continues to engage in drug trafficking, and that he has used his residence as part of drug trafficking, that he continues to do so.

*ATWOOD's Stash Location – Target Location # 5*

161.    182 Glen Charlie Road, Wareham, Massachusetts, is a single-family residence. The residence includes natural-colored siding and several large windows facing the street.  The roof includes gray shingles.  The residence is located at the corner of Glen Charlie Road and Gauvin Street.  There is large driveway immediately in the front of the residence.  I believe that ATWOOD uses this residence to stash oxycodone pills as agents surveilled him to this residence after oxycodone deals with CAMPBELL on February 16, 2023 and March 2, 2023.  In addition, on March 2, 2023, agents observed ATWOOD at Target Location # 5 prior to meeting with

CAMPBELL.  On June 8, 2023 and June 22, 2023, agents observed ATWOOD's Blue GMC Sierra parked in the driveway of Target Location # 5.

162.     I believe that two individuals actually live at this residence.  I believe that Kari Ann and John Vasconcello reside at Target Location # 5.   According to Kari Vasconcello's Massachusetts license, her address is Target Location # 5.  On June 1, 2023, Kari Vasconcello renewed the registration on a 2008 Mazda CX7 also listing Target Location # 5 as her residence. According to the Massachusetts Registry of Motor Vehicles, John Vasconcello maintains an identification card listing Target Location # 5 as his residence.  A Facebook profile for "John Vasconcello" includes ATWOOD as a friend.  Insurance information shows that John and Kari Vasconcello together have filed 20 insurance claims listing this address since 1994.  The last claim is from Kari Vasconcello on February 12, 2019.

Link to Criminal Activity

163.     I believe that ATWOOD uses Target Location # 5 to store oxycodone pills.  I know based on my training and experience that drug traffickers like ATWOOD will use stash locations to store drugs and drug proceeds.  In my training and experience, drug traffickers will keep several types of evidence related to their drug trafficking activities at such stash locations because the stash location is often times where the drugs are divided up and packaged for re-distribution.  As described above, I believe that ATWOOD receives quantities of oxycodone pills from CAMPBELL that he then re-distributes to others.  I believe that ATWOOD uses scales, pill counters and baggies, and other packaging as part of his re-distribution activities.  These items are likely to be located at Target Location # 5 because I believe ATWOOD and CAMPBELL conducted a drug deal here on December 3, 2022; on February 16, 2023, ATWOOD travelled to this location after obtaining oxycodone pills from CAMPBELL; and on March 2, 2023, ATWOOD was at this location before and after a drug deal with CAMPBELL.  Therefore, there is probable

cause to believe that ATWOOD uses this location to store drug proceeds and drugs.  Moreover, as stated above, ATWOOD has a long history of trafficking narcotics.  Given this long history, and his pattern of using Target Location # 5 to store oxycodone pills after meeting with CAMPBELL, there is probable cause to believe that ATWOOD continues to engage in the Target Offense and that evidence of the same will be found at Target Location # 5.

*VEIGA's Residence 2 – Target Location # 6*

164.    7 Stewart Drive, Unit #732, Abington, Massachusetts is a two-bedroom apartment located inside The Point Apartment Complex.  7 Stewart Drive is a three-level, multi-unit building with tan/brown siding and white trim.  The front door is white, and there is a sign directly above the dark-colored front door that reads, "7 Stewart Drive."  There is a call box to the left of the door.  The roof includes gray shingles.  There are a series of windows on each of the three floors of the building.  There is a parking area directly in front of 7 Stewart Drive.  The area in front of the building includes grass and several shrubs/trees.

165.    I believe that VEIGA stays at this as a residence for several reasons.  First, VEIGA's Black BMW has been observed parked at 7 Stewart Drive on several occasions.  On May 4, 2023, at approximately 4:48 p.m. agents observed the Black BMW parked in front of 7 Stewart Drive.  On May 10, 2023, agents observed the Black BMW again parked in front of 7 Stewart Drive.  That evening, VEIGA was observed leaving the apartment complex and then returning at approximately 9:55 p.m.  VEIGA walked into 7 Stewart Drive and was seen walking upstairs in the building.  On May 11, 2023, agents observed VEIGA depart 7 Stewart Drive, while driving the White Acura, before meeting with ███████ in Brookline, Massachusetts.  In addition, during the interception period of May 2, 2023 to May 31, 2023, location information for Target Telephone 2 showed that phone in the vicinity of 7 Stewart Drive, Abington, Massachusetts during

both daytime and nighttime hours.  On June 22, 2023, an agent conducting surveillance observed VEIGA enter into 7 Stewart Drive.

166.    In addition, during an intercepted all on May 6, 2023, a female believed to be VEIGA's girlfriend ("VEIGA's Girlfriend")[45] called him and said, "Our unit number is 732, right?"  VEIGA responded, "Yeah."  VEIGA and VEIGA's Girlfriend then discussed her difficulty in getting into the building.  I believe that during this call, Unit 732 was identified as the unit where VEIGA and his girlfriend reside.  In addition, the female's difficulty in getting into the building is consistent with the building having a call box like the one observed to the left of the dark-colored front door of 7 Stewart Drive, Abington, Massachusetts.

Link to Criminal Activity

167.    I believe that VEIGA uses Target Location #6 in furtherance of the Target Offense. First, on May 4, 2023, VEIGA was seen leaving 7 Stewart Drive before meeting with GONSALVES and providing oxycodone pills to GONSALVES.  Therefore, there is probable cause to believe that VEIGA stores drug paraphernalia, packaging, baggies and scales, all of which I know based on my training and experience to be items possessed by people who distribute drugs. Second, on May 11, 2023, VEIGA drove the White Acura from 7 Stewart Drive, Abington, Massachusetts before meeting with ████████  This provides further probable cause to believe that VEIGA keeps drug paraphernalia like packaging, baggies, scales at this location. Furthermore, as described above, on May 30, 2023, during an intercepted phone call, VEIGA stated, "And I got another fucking 50 at my girl's closet."  Based on my training and experience, and knowledge of the investigation, I believe that VEIGA stated that he stores drug proceeds. i.e.

---

[45] I believe that this female is VEIGA's girlfriend for several reasons: (1) the context of this call suggests that VEIGA and this female live together; (2) telephone records for the phone used by VEIGA's Girlfriend in this call lists a subscriber who has the same last name as the person to whom the White Acura is registered, which is a female; and (3) as described above, the White Acura has been seen parked in front of 7 Stewart Drive, Abington, Massachusetts, consistent with the owner of the vehicle living there.

$50,000, at the apartment he shares with his girlfriend, Target Location # 6 ("And I got another fucking 50 at my girl's closet.").  This provides probable cause to believe that VEIGA keeps items like ledger or records to track drug proceeds, or a money counter or safe at Target Location # 6 (which are also items I know drug traffickers use in connection with drug proceeds).  Furthermore, the probable cause included above shows that VEIGA has participated in the Target Offense for a long period of time.  I know from my training and experience that long-time drug traffickers like VEIGA tend to keep evidence related to their illicit activities despite any passage of time.  Moreover, based on toll records as discussed above, I believe that VEIGA continues to engage in the Target Offense, including with CAMBELL and GONSALVES.

### DRUG TRAFFICKERS' AND MONEY LAUNDERERS' USE OF RESIDENCES AND CELLULAR TELEPHONES

168.    Based on my training and experience, and the collective experience of other agents participating in this investigation, I know that traffickers of controlled substances frequently maintain paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents with whom I have worked, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

169.    I also know from my training and experience that drug traffickers have an interconnected and symbiotic relationship with money launderers. Drug suppliers operating outside of the United States rely on illicit money brokers and money launderers to launder and repatriate their drug proceeds. The money launderers need to keep detailed records of their financial transactions to show proof of the laundering. After the money is deposited into accounts, many of the financial transactions made in furtherance of laundering are conducted electronically

using phones. It is common for money launderers to keep detailed records of their financial transactions, including the account numbers to which they send laundered proceeds. I know that many of these records are stored in electronic devices such as phones. Moreover, it is common for money launderers to collect large sums of drug proceeds and store them before laundering to reduce the number of times they are required to make trips to deposit the sums into the banking or financial systems.

170.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers and money launderers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

171.    Likewise, money launderers keep detailed records of their financial transactions to evidence them. Because money launderers provide repeated services to some DTOs, it is necessary for them to maintain these records for extended periods to avoid unnecessary and duplicative

exchanges of banking account information. This information is normally stored in the electronic devices that money launderers use to conduct financial transactions such as cell phones.

172.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

173.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers and money launderers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering are often kept in their residences. Moreover, the cash proceeds of drug trafficking and money laundering often contain traces of the narcotics sold or bought by the drug dealers.

174.     Moreover, drug traffickers and money launderers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking/money laundering activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search

warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

175.    When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

176.    The law enforcement agents will endeavor to search only those areas of the Target Locations which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) one of the Target Subjects.

177.    Finally, as noted above, evidence of drug and money laundering crimes can be found in the cell phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

178.    It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular

numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

179.   As with most electronic/digital technology items, communications made from an electronic device, such as a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.  Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device such as a cell phone used such a device.

180.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a cell phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a

fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

181.    The law enforcement agents will endeavor to search and seize only the cell phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) one of the Target Subjects.

182.    This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

183.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

184.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to

5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

185.    The passcode that would unlock the Subject Device/Apple device(s) found during the search of the Target Locations is not currently known to law enforcement. However, during the course of this investigation, a number of the Target Subjects have used Apple iPhones to conduct their drug and money laundering business. Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device/Apple device(s) found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the Target Subject to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

186.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

187.     I have participated in the execution of numerous search warrants at the residences

of drug traffickers similar to the targets of this investigation. In a substantial number of residential

searches executed in connection with the drug investigations in which I have been involved, the

following types of drug-related and/or money laundering evidence typically have been recovered

in both conventional and electronic formats:

     a.  controlled substances;

     b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

     c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

     d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

     e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

     f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

     g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites

viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   firearms and other dangerous weapons; and

i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

188.   Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking and/or money laundering. I believe that evidence of their drug trafficking and/or money laundering offenses will be found inside each of the Target Locations and on certain cellular telephones seized therefrom.

## CONCLUSION

189.   Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §846, and that evidence of said criminal offense, as set forth herein and in Attachments B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

190.   I, Joshua Fries, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Joshua Fries

JOSHUA FRIES

TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION


Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 30 th day of June, 2023

HONORABLE DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS